**Dr. Frank W.R. HUBERT, Individually and in His Official Capacity as Chancellor of the Texas A & M University System, et al., Appellants,**

v.

**HARTE–HANKS TEXAS NEWSPAPERS, INC., d/b/a Bryan-College Station Eagle, Appellee.**

No. 13580.

Court of Appeals of Texas, Austin.

May 11, 1983.

Rehearing Denied June 8, 1983.

W. James Kronzer, Kronzer, Abraham, Watkins, Nichols, Ballard & Friend, Houston, for appellants.

David H. Donaldson, Jr., Graves, Dougherty, Hearon & Moody, Austin, for appellee.

Before PHILLIPS, C.J., and SHANNON and POWERS, JJ.

SHANNON, Justice.

Appellee Harte-Hanks Texas Newspapers, Inc., doing business in Bryan as the Bryan-College Station Eagle, filed suit in the district court of Travis County against appellants Dr. Frank Hubert, Chancellor of the Texas A & M University System, the Board of Regents of Texas A & M, the "Search Advisory Committee" of the Board of Regents, and twenty-eight persons who are members of the Board of Regents or the "Search Advisory Committee." Appellee by its suit sought a writ of mandamus pursuant to § 8 of the Open Records Act, Tex.Rev.Civ.Stat.Ann. art. 6252–17a (Supp. 1982) [1] compelling appellants to make available the names and qualifications of candidates for the office of president of Texas A & M. After a bench trial, the district court signed an order granting the writ which commanded appellants to release all of the candidates' names and qualifications to appellee. This Court will affirm the order of the district court.

[1.] The Open Records Act was enacted by the legislature in 1973. Section 1 of the Act, a declaration of policy, states:

Pursuant to the fundamental philosophy of the American constitutional form of representative government which holds to the principle that government is the servant of the people, and not the master of them, it is hereby declared to be the public policy of the State of Texas that all persons are, unless otherwise expressly provided by law, at all times entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created. To that end, the provisions of this Act shall be liberally construed with the view of carrying out the above declaration of public policy.

Section 3, the general disclosure provision of the Act, provides "[a]ll information collected, assembled, or maintained by governmental bodies pursuant to law or ordinance or in connection with the transaction of official business is public information and available to the public...." Eighteen exceptions to this general requirement, including the exception disputed in this lawsuit, are then listed.

Sections 7 and 8 of the Act set forth the procedure to be followed when information is requested under the Act. A governmental body receiving a request for information which it believes section 3 excepts from disclosure may, within 10 days, request an attorney general's opinion as to whether the information is public. If the attorney general deems the information to be public, the agency must make the information available to the person requesting it. If the agency refuses to comply with the attorney general's ruling, the party seeking the information may bring suit for a writ of mandamus to compel disclosure.

In August 1980, the Texas A & M Board of Regents created a "Search Advisory Committee" to provide assistance in the search for candidates for the office of president of Texas A & M. The regents appointed Dr. Frank Hubert to be executive officer of the search committee. Also appointed to the committee were Texans active in education, business, and industry. The committee sought nominations for the office of president, and, after evaluating the nominees, prepared a list of one hundred seventy-one names. The list was narrowed to thirty-five persons, whose names were recommended to the Board of Regents.

In January 1981, while the search was in process, appellee requested Dr. Hubert to furnish the names and qualifications of all of the presidential candidates considered by the Search Advisory Committee. Dr. Hubert did not produce the information, but on advice of counsel, prepared a request for an opinion of the attorney general as to whether the information was required to be disclosed under the Open Records Act. In June 1981, the attorney general ruled that the names and qualifications of candidates considered by the search committee must be disclosed, but that the committee's final recommendations on candidates to the Board of Regents were intra-agency memoranda excepted from the general disclosure requirement of the Open Records Act by § 3(a) of the Act. Tex. Att'y Gen. ORD–273 (1981). After the attorney general's opinion was released, appellants continued to resist disclosure, resulting in appellee's suit and the district court's order. Appellants did not request nor did the district court file findings of fact and conclusions of law.[2]

Appellants attack the district court's order by four points of error which present two issues: (1) whether appellants are prevented from defending the suit for mandamus because they failed to file a suit challenging the attorney general's opinion within three days after they received it, and (2) whether the requested information is excepted from disclosure by § 3(a)(2) of the Open Records Act.

■ In support of the district court's order, appellee argues that appellants are barred from asserting the § 3(a)(2) exception as a defense to the suit in mandamus because they failed to challenge the attorney general's opinion within three days after its receipt. We do not agree with the argument. Appellee bases its contention on § 10 of the Act. Section 10(b) states that a custodian of public records commits a criminal offense if, acting with criminal negligence,[3] he refuses to release public records to anyone requesting them under the provisions of the Act. The custodian may assert as an affirmative defense to *criminal* prosecution under this section that within three working days of receipt of an unfavorable attorney general's opinion, he filed a cause of action seeking relief from compliance with the opinion. Section 10(c)(3). The Act provides for filing of such suit to protect a custodian of records from *criminal* liability. If the party seeking the records pursues his *civil* remedy, a suit for mandamus, the Act does not provide that the custodian may file a separate suit challenging the attorney general's ruling. But the custodian's inability to challenge the attorney general's opinion except to preclude criminal liability does not mean the custodian will be prevented from asserting in the *mandamus* action that the records are excepted from disclosure. In the mandamus proceeding, the public official may re-assert any grounds upon which he deems the record to be excepted from the general disclosure requirement of the Act. If the district court agrees with the public official and concludes the re-

---

2. Appellee argues that because the district court filed no findings of fact and conclusions of law, this appeal should be determined upon the basis that the district court agreed with appellants and applied the test they urged, but still resolved the case against them. We decline to affirm the judgment upon that basis.

3. For the statutory definition of "criminal negligence," *see* Tex.Pen.Code Ann. § 6.03(d) (1974).

quested information to be exempt from disclosure, mandamus will not lie. If, however, the district court determines the information must be disclosed,[4] the official must release the information, subject to his right to appeal the order of the district court.

In the present appeal, appellants could not challenge the attorney general's opinion in a separate lawsuit. After the attorney general ruled, appellants' only course of action was to comply with the opinion or refuse to release the records and contest the mandamus proceeding brought by appellee.[5] In the mandamus proceeding, however, appellants properly asserted their contention that the requested materials were excepted from disclosure under § 3(a)(2) of the Act. The district court disagreed with appellants' contention and ordered appellants to comply with the attorney general's opinion. On appeal to this Court, appellants properly assert as a point of error their contention that the district court erred in holding that § 3(a)(2) did not protect the names and qualifications of the candidates from disclosure.

Appellants claim they are not required to disclose the names and qualifications of the candidates the Search Advisory Committee considered because § 3(a)(2) of the Open Records Act excepts this information from disclosure. Section 3(a) provides in relevant part:

(a) All information collected, assembled, or maintained by governmental bodies pursuant to law or ordinance or in connection with the transaction of official business is public information and available to the public during normal business hours of any governmental body, with the following exceptions only:

(1) information deemed confidential by law, either Constitutional, statutory, or by judicial decision;

(2) information in personnel files, the disclosure of which would constitute clearly unwarranted invasion of personal privacy; provided, however, that all information in personnel files of an individual employee within a governmental body is to be made available to that individual employee or his designated representative as is public information under this Act....

Appellants insist subsection (a)(2), relating to information in personnel files, prohibits disclosure of the information sought by appellee. Appellee concedes, for sake of argument, the material it seeks is information contained in a "personnel file," but maintains the disclosure of that information does not constitute "a clearly unwarranted invasion of personal privacy."

The dispute between the parties focuses on how "a clearly unwarranted invasion of personal privacy" should be determined. Appellants urge this Court to adopt a balancing test weighing a person's right to privacy against the public's interest in disclosure which is applied by the federal courts to cases decided under the Freedom of Information Act, 5 U.S.C. § 552 (1977 & Supp.1982).[6] Appellee asserts, on the other

---

4. In determining whether disclosure is required, the district court should give due consideration to the attorney general's opinion. Opinions of the attorney general, while not binding on the courts, are persuasive. *E.g., Jones v. Hutchinson County,* 615 S.W.2d 927, 931 (Tex.Civ.App.1981, no writ).

5. The Supreme Court has recognized that an agency may, in the mandamus proceeding, contest disclosure. *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 678 (Tex.1976). Appellees' fear that our refusal to give binding effect to the attorney general's opinion in the mandamus proceeding will render the procedure for procuring the opinion a futile exercise is unfounded. Most agencies requesting opinions abide

by the attorney general's ruling without resort to further legal proceedings. Comment, *The Texas Open Records Act: A Section-by-Section Analysis,* 14 Hous.L.Rev. 398, 430 (1977).

6. The relevant exception under the federal Freedom of Information Act is 5 U.S.C. § 552(b)(6) (1977), which provides "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" is exempt from disclosure. The federal courts balance the public's interest in obtaining the information with the individual's right to privacy. *See, e.g., Department of Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *Campbell v. United States Civil Service Commission,* 539 F.2d 58 (10th Cir.1976).

hand, that this Court's determination of whether disclosure would constitute an unwarranted invasion of privacy should be guided by the holding in *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668 (Tex.1976). In *Industrial Foundation,* the Supreme Court interpreted what information is excepted from disclosure under § *3(a)(1)* of the Act, which restricts availability of information "deemed confidential . . . by judicial decision." The petitioner in *Industrial Foundation* contended that information which formed the basis for an invasion of privacy tort under Texas law is the type of information which should be deemed confidential by the courts. Specifically, any information which, if publicized by a private person, would render that person liable for the tort of invasion of privacy, i.e., "public disclosure of private facts," as defined in *Billings v. Atkinson,* 489 S.W.2d 858 (Tex.1973), should be deemed confidential under § 3 (a)(1). The Supreme Court agreed with petitioner, holding that information (1) which contains highly intimate or embarrassing facts which, if publicized, would be highly objectionable to a reasonable person and (2) is not of legitimate concern to the public, is confidential and may not be disclosed. *Industrial Foundation of the South v. Texas Industrial Accident Board, supra,* at 685.

Appellants insist the legislature must have intended a different treatment for "information in personnel files" since that subject was treated separately in § 3(a)(2). Accordingly, appellants argue, this Court should not regard the test chosen by the Supreme Court in *Industrial Foundation* to apply to § 3(a)(1) as equally applicable to

§ 3(a)(2). The proper test, they claim, is one balancing a person's right to privacy against the public's interest in disclosure as applied by the federal courts in cases decided under the Freedom of Information Act.

■ Nothing in the language of § 3(a)(2) indicates that either the federal balancing test or the *Industrial Foundation* test should be employed in determining cases involving "information from personnel files." Nevertheless, this Court has determined, finally, that the *Industrial Foundation* test for information deemed confidential by law under § 3(a)(1) of the Open Records Act should apply also to § 3(a)(2). Applying the *Industrial Foundation* analysis to § 3(a)(1), and adopting the federal balancing test for § 3(a)(2), as urged by appellants, would impart unnecessary complexity into judicial interpretation of the statute. The basic question in determining whether information should not be disclosed under §§ 3(a)(1) and 3(a)(2) is whether publication of the information would constitute an invasion of an individual's privacy. As the Supreme Court held in *Industrial Foundation,* the proper way to evaluate a claimed invasion of privacy is to apply the state tort law dealing with that injury. If disclosure of the material would result in the privacy tort of "public disclosure of private facts," then the material should remain confidential. Application of this test will result in the proper "balancing" of an individual's right to privacy and the articulated purpose of the Open Records Act— that the people are entitled to full and complete information regarding the affairs of government and the acts of its officials. Open Records Act § 1.[7]

Appellants also cite several federal cases discussing the privacy rights of labor union members. Because of the sensitive nature of the employer-union relationship and the special consideration it receives under federal law as evidenced by the National Labor Relations Act, we regard these cases as inapplicable to the present appeal.

Furthermore, it is not at all clear that if this Court were to apply the federal "balancing" test, appellants would prevail. The information excepted from disclosure under the federal act must be of a "highly intimate nature." In-

formation concerning business or professional relations is not of this type. *See, Sims v. CIA,* 642 F.2d 562 (D.C.Cir.1980); *Board of Trade v. Commodity Futures Trading Commission,* 627 F.2d 392 (D.C.Cir.1980).

**7.** Not only does this test reach the proper legal result, but is also relatively easy to apply. "Balancing" tests such as the one appellants propose are frequently of little analytical value. No method exists to determine the "weight" given the factors to be balanced. Thus the court, without an objective measure to weigh

In the present appeal, appellee newspaper sought the names of candidates for president of Texas A & M. Appellants refused to release the information, claiming disclosure would be a clearly unwarranted invasion of privacy. We do not regard the candidates' names to be facts of a highly embarrassing or intimate nature, which, if publicized, would be highly objectionable to a reasonable person. *Industrial Foundation of the South v. Texas Industrial Accident Board, supra.* The information sought to be attained does not show how the candidate's name was submitted to the Search Committee. Even so, many persons might well be honored that they were considered for the presidency of one of the state's large universities. Certainly, those candidates who caused their names to be submitted to the search committee should not be heard to complain of disclosure. Although those candidates who did not cause their names to be placed with the search committee may be in a different position, still the information sought is plainly not of the intimate or embarrassing nature which the Supreme Court discussed in *Industrial Foundation.* The records sought in that case were claims injured workers filed with the Industrial Accident Board for worker's compensation benefits. The sensitive information the Supreme Court detailed as being exempt from disclosure involved claims by victims of sexual assaults, victims of mental or physical abuse in the workplace, illegitimate children, psychiatric patients, persons who attempted suicide, or persons suffering injuries to sexual organs. Plainly, this character of intimate or embarrassing information can be distinguished from the material sought in the present appeal.

Furthermore, the public is legitimately concerned with the names and qualifications of candidates for the presidencies of state universities. *Industrial Foundation of the South v. Texas Industrial Accident Board, supra.* The taxpayers of this state

finance one of the larger systems of higher education in the country. That highly qualified and conscientious administrators are selected and entrusted to conduct the affairs of these institutions is a matter of legitimate public interest, a fact which appellants seemingly ignore.

Even should we assume appellants could establish that release of the information would infringe on the candidates' privacy, disclosure should still be permitted. As appellees emphasize, the part of the Open Records Act in dispute excepts information in personnel files from disclosure only if a *clearly unwarranted* invasion of privacy would occur. Therefore, the statute places a further burden on litigants who successfully establish that publication of material would result in an invasion of privacy. Since we do not believe any invasion of privacy has occurred in the present case which would warrant nondisclosure, it is unnecessary to determine when such an invasion would be clearly unwarranted.[8]

Appellants introduced expert testimony that some qualified candidates for university administrative positions would be discouraged from applying for a position if they thought their names might be disclosed. While this factor might persuade the legislature to create an Open Records Act exception for such applicants, it is not evidence of "a clearly unwarranted invasion of personal privacy" under current Texas tort law or the Open Records Act. Furthermore, we presume any fact question as to the effect of disclosure was resolved by the district court against appellants, as they did not request and the district court did not file findings of fact and conclusions of law. *E.g., Buchanan v. Byrd,* 519 S.W.2d 841 (Tex.1975).

Finally, § 1 and § 14(d) of the Open Records Act command that the provisions of the Act are to be liberally construed to

---

competing interests, must substitute its subjective judgment to reach the same result which would have been obtained without use of the balancing test.

8. For discussion of the additional burden of proving an invasion of privacy is "clearly unwarranted," *see, Department of the Air Force v. Rose,* 425 U.S. at 378 n. 16, 96 S.Ct. at 1607 n. 16.

favor disclosure of public records. The practical effect of a statutory directive for liberal construction of an act is that close judgment calls are to be resolved in favor of the stated purpose of the legislation. In the present appeal, this Court is not required to make a "close" call. Nevertheless, a liberal construction of the Open Records Act seems to compel disclosure of information, even when disclosure might cause inconvenience or embarrassment for some persons.[9] It is of some importance in this connection to observe that both the majority and dissenting justices in *Industrial Foundation* recognized in the Open Records Act a strong legislative preference for disclosure over confidentiality. *Hutchins v. Texas Rehabilitation Comm'n,* 544 S.W.2d 802 (Tex.Civ.App.1976, no writ).

If appellants are of the view that their privacy interests do not receive enough consideration under the present Act, they must address their concerns to the legislature to amend the Act to strike the proper balance.

The judgment of the district court is affirmed.

PHILLIPS, Chief Justice, concurring.

I concur with Judge Shannon's holding that the names involved should be disclosed under the Open Records Act and his refusal to use a balancing test in this case. However, I would be careful to point out that we are not limited to a common law tort recognized by judicial decision only but that § 3(a)2, includes any of the invasions of privacy set out in 3(a)1, i.e., "information deemed confidential by law, either constitutional, statutory or by judicial decision." Tex.Rev.Civil Stat.Ann. art. 6252–17a (Supp.1982).

POWERS, Justice, dissenting.

I respectfully dissent. In my view, the majority have assigned to subsection 3(a)(2) of the Texas Open Records Act[1] a meaning which is erroneous for the reasons which follow:

1. The majority gives to subsection 3(a)(2) a meaning which renders the subsection superfluous, and therefore meaningless, because whatever is excluded from compulsory disclosure by subsection 3(a)(2), in the view of the majority, is pre-emptively excluded by the operation of subsection 3(a)(1). This interpretation is therefore contrary to the rule of construction that statutes should be read as a whole and construed to give meaning and purpose to every part. *Ex parte Pruitt,* 551 S.W.2d 706, 709 (Tex.1977); *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 551 (Tex. 1981).

2. The meaning assigned by the majority to subsection 3(a)(2) of the Act is legally impermissible because it requires consequences which are unjust and oppressive, because the majority's interpretation requires that State agencies disclose information to the public even though such disclosures will constitute clearly unwarranted invasions of personal privacy by placing in a false light the individuals to whom the information refers. *Gulf Ins. Co. v. James,* 143 Tex. 424, 185 S.W.2d 966, 969 (Tex. 1945). Because the State has no constitutional means of controlling the further distribution or use of the information, so as to prevent an injury, the State's initial release of the information constitutes in and of itself an element of the tort. *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 684 (Tex. 1976). As so interpreted to require disclosure of information that will under the undisputed evidence have the effect of plac-

---

**9.** As discussed, appellants believe disclosure in the present case would cause embarrassment for some applicants and discourage some qualified persons from applying for similar positions in the future. Assuming this to be true, the harm from disclosure is certainly no more substantial than the potential harm of disclosure alleged in *Industrial Foundation,* where respondents asserted the very real possibility that

release of names of worker's compensation claimants might result in retaliatory discharge or job discrimination against the claimants. Despite this possible harm, the Supreme Court required the records to be disclosed.

**1.** Tex.Rev.Civ.Stat.Ann. art. 6252–17a (Sup. 1982), hereinafter the "Act."

ing certain individuals in a false light, in violation of their right to privacy, the Act becomes unconstitutional in that it discriminates against such individuals and denies them substantive due process of law.

3. The majority interpretation destroys, in my view, the distinctions that the Legislature intended to make in the coverage and effect of the two subsections 3(a)(1) and (2), in violation of this Court's duty to give effect to the intention of the Legislature. *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 384 (Tex. 1982). The balance of this dissenting opinion illustrates the substance of the foregoing assertions.

The district court order directs that a writ of mandamus issue "to allow inspection and copying of documents in [appellants'] possession or under their control [which contain] the names and qualifications of candidates for the position of President of Texas A & M University. . . . " In appellants' appeal from that order, they raise three points of error, all to the effect that the district court erred in its order because the information demanded by appellee was excepted from compulsory disclosure under subsection 3(a)(2) of the Act. Subsection 3(a)(2) excludes the following information from the general requirement that public information be disclosed on request:

information in personnel files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

In the trial below, the following evidence was uncontroverted and may therefore be viewed as established and undisputed: The Board of Regents of the Texas A & M University System appointed 22 individuals to serve as members of a "search advisory committee." The committee were charged generally to assist the Board in selecting a person to fill a vacancy in the office of President of Texas A & M University, and in that connection, the committee were assisted by a staff paid by the University and provided with University facilities and the expenditure of public money. The staff mailed some 5,000 to 6,000 letters through-

out the nation, as a means of soliciting, on behalf of the chairman of the Board of Regents, nominations for the vacant office of University President. The letters contained assurances that the nominations would be held in confidence. The numerous addressees included former students, trustees of the University's development foundation, the members of the National Academy of Science, the members of the National Academy of Engineering, the chief executive officers of the "Fortune 500" companies, presidents and chancellors of approximately 1,500 colleges and universities, members of judicial organizations, ambassadors in the diplomatic service of the United States, members of the United States "military establishment," officers in an organization composed of mothers of Texas A & M students, and others. In reply to these letters, the staff received the names of approximately 560 individuals whom the addressees recommended for the presidency of the University. In addition, approximately 25 individuals submitted their own names in nomination for the position. When duplicate nominations were eliminated, there remained 400 individuals to be considered for the presidency. These 400 individuals were primarily employees of other universities and colleges; they ordinarily occupied high office or positions in their employment and served at the "pleasure" of the governing bodies of their institutions, that is, they did not have an assured term of employment, whether by reason of contract, statute, or regulation. The staff compiled biographical information on the 400 nominees, using information obtained from both published sources and a private employment firm that specializes in high academic administrative positions. From among the 400 individuals, the staff selected 171 individuals for consideration by the search advisory committee. The committee, in turn, selected 35 individuals for consideration by the Board of Regents. Throughout the process described above, none of the 400 individuals considered by the staff were informed of their nomination; presumably, none were aware that they were under consideration for the office. At the time of trial, however, about

10 individuals of the 35 recommended to the Board of Regents had been contacted about the presidency and seven had been interviewed in that regard.

Opinion evidence was received at trial to the effect that the procedure described above is typical of that followed by institutions of higher learning for the purpose of selecting high administrative officials and to the effect that confidentiality is an essential and customary aspect of the procedure. According to such testimony, confidentiality is generally required, and was indispensable in the present case, because

well-qualified individuals who are currently serving in high administrative positions at other institutions will withdraw themselves from consideration if it be disclosed that they are under consideration for other employment, but most importantly, for our purposes, whether they withdraw themselves or not, under the undisputed evidence they will be *injured* in their present offices, professions, occupations, or employment, owing to certain relational factors inherent therein, by the mere disclosure of the fact that they had been considered for the vacant office of President and had not been offered the position.[2]

**2.** The State's Commissioner of Education testified in part as follows:

College presidents are not shrinking violets, but they are very sensitive. If you are going to hire a top level administrator for a university, you are going to have to steal him from somewhere. You don't find unemployed college presidents. You are going to have to steal him from another institution, from a government agency or from, perhaps even military, depending on the institution, and that means that this individual has his constituency, has a governing board and a group that he is working for. And if he becomes a candidate, an active candidate for a job, and this word gets back to his employers or his constituency, his effectiveness in his job is going to be deeply eroded, the morale of his staff is going to be damaged, his effectiveness in his job will be damaged. So, most of these people will not even consent—if they are top level people, will not consent to apply for a job. They will prefer to be nominated. Now, the reason for this is that this permits them when they are then asked, if their name does get leaked, is it in fact—or have you applied for a certain job or are you a candidate for a certain job, he can say "No, I'm not a candidate. I may have been nominated, but to my knowledge I'm not at this time a candidate."

This is important for these individuals to be able to react this way in order to remain effective with their governing board. If a person is aware that he—if his governing board is aware that he has applied for a job, then his board wants to ask themselves and ask him, "Why are you unhappy? What is the problem here?"

If he doesn't make the final cut as one of the final candidates, of course, they will begin to ask, you know, "What is the matter with our President? He can't even make the final cut at XYZ University." So, it's not something that you conduct in the open. It's something that the individual is very sensitive about, and my concern—of course, I know you are

concerned about the privacy of the individual, but as the Commissioner of Higher Education I'm concerned for the quality of higher education and quality of leadership in higher education. I'm very concerned about the impact of this on the process of selection. Now, you can't keep pulling up a carrot to see how it's growing, and part of the difficulty of constantly releasing it to the press and carrying it out before the press, the selection process, I think you are damaging the selection process. And as a result, if this were the procedure . . . you would damage the process in that the candidates would eliminate themselves from being considered in Texas. Many people would just say if this is going to be played out in an open arena, if my name is going to be made public on this, if I'm going to have to explain to my present governing board or the President of the United States if he's a cabinet level member or subcabinet level member, if he's going to have to explain that he's a candidate, he's simply going to say, "No, I simply can't be considered because I have to remain effective in my current situation."

And another witness responded as follows when asked how an individual's private interest would be affected adversely by a lack of confidentiality in the selection process:

Because of the simple fact that—of what I was just addressing, that the—that any college President serves a great many publics, a great many publics which he must mold together in a collaborative and consulted [sic] fashion to make that institution move forward. And when it is known that any individual is involved for another position, being considered by another institution, it cannot in any way but erode his effectiveness at that [sic] his own institution that he very likely spent years at building a solid base.

There is another factor that is involved. I think it is a very critical factor. . . . That is . . . if a person is an unsuccessful applicant and he has been before the public, this does

The issue before us is whether the district court properly applied the Act to the undisputed facts recited above.

Although the decision to issue a writ of mandamus is ordinarily within the equitable discretion of a court, where the writ is sought to compel an agency to disclose information under the Open Records Act, the court is not "free to exercise equitable discretion in denying the writ where the exercise of such discretion would contravene the overall scheme of the Act.... [T]he court's task is to enforce the public's right of access given by the Act." *Industrial Foundation, supra,* 540 S.W.2d 668, 675 (Tex.1976). That is, the trial court *must* issue a writ of mandamus if disclosure is required by the Act.

The Act requires disclosure of all public information upon request, unless the information falls within one or more of the seventeen exceptions listed in the Act. While the Act expressly requires a liberal interpretation in favor of disclosure, in view of the salutary declarations and purposes expressly set forth in section one of the Act, the requirement of a liberal interpretation may not be allowed to diminish the scope and effectiveness of any one of the seventeen exceptions. The people of the State, through the same authorized voice which mandated a general disclosure of public information as a matter of public right, also expressly renounced any right to information which falls within the excepted categories.

In the present case, appellants resisted disclosure of the names and qualifications of the 400 individuals described above, asserting the "personnel files" exception contained in § 3(a)(2) of the Act. Appellee does not challenge appellant's assertion that the information sought is "in personnel files" within the meaning of § 3(a)(2), and I would so hold, as the majority does. This exception may have been so limited for a number of reasons, but I think the reasons which justify an exception in favor of *current* or *former* personnel if disclosure would constitute a clearly unwarranted invasion

of personal privacy, apply equally to prohibit compulsory disclosure of the same information when it pertains to *prospective* personnel.

We are required therefore to consider whether the disclosure of the information involved in this case would constitute a "clearly unwarranted invasion of personal privacy."

The parties join issue primarily on the applicability of the principles and holdings stated by the Supreme Court of Texas in *Industrial Foundation, supra.* Although in that decision the Supreme Court specifically considered another of the seventeen exceptions contained in the Act, namely that provided by § 3(a)(1), the decision and opinion furnish a strong analogy in the present case, for both cases involve the principle of individual privacy, a principle made expressly applicable to the present case by the terms of § 3(a)(2) and made applicable in *Industrial Foundation* through the medium of the three sources of law which § 3(a)(1) incorporates by reference to establish an exception to the Act's general requirement of mandatory disclosure: constitutional law, statutory law, and judicial decisions at common law. And because the parties advance decidedly different interpretations of the opinion in *Industrial Foundation,* we may not avoid an explicit analysis of that opinion, which I now offer.

The Industrial Foundation of the South sued the Texas Industrial Accident Board, among other defendants, seeking to compel them to disclose information which the Board possessed respecting individuals who had made personal-injury claims under the Texas Worker's Compensation Law, Tex. Rev.Civ.Stat.Ann. art. 8306 *et seq.* (1967 and Supp.1982), an act administered by the Board. Resisting disclosure of the information, the Board asserted that the information was excluded from mandatory disclosure by reason of § 3(a)(1), which excepted from disclosure "information deemed confidential by law, either Constitutional, statutory, or by judicial decision." The Board

great damage to that individual on his home     campus. He is really in a no-win situation.

contended that the information was "deemed confidential" by all three grounds of law—constitutional, statutory, and judicial decision. On appeal, the Supreme Court discussed each of the three grounds. We need not concern ourselves, in this case, with the question of whether the information was "deemed confidential by . . . statutory" law, a matter discussed at pages 676–77 of the Court's opinion in *Industrial Foundation,* but the Court's discussion of the constitutional and common law rights of privacy do concern us in the present case.

The precepts which *Industrial Foundation* draws from the Act may be summarized as follows: [3]

**3.** The Court's opinion in *Industrial Foundation* has been criticized in several respects mentioned in a law review note. Note, *The Release of Private Information Under Open Records Laws,* 55 Tex.L.Rev. 911 (1977). These criticisms concern matters also raised by the briefs of the parties in the present case relative to the proper interpretation of the opinion.

In the view of the author of the note, the Court failed to "adequately define the public interest" which the one requesting highly private information must prove in order "to override the Section 3(a)(1) exception." *Id.* at 917. Moreover,

If the balancing test adopted [by the Court] measures the overall public interest in disclosure, a court must evaluate all the possible effects of disclosure and decide whether their sum is of sufficient public import to outweigh the privacy claim. If, however, the standard requires that a particular requester's interest coincide with the interest of the general public, a court could justify a limited inquiry into a requester's intent to discover whether his interest in the information accords with that of the public or is instead merely private.

*Id.* at 917–18. The last sentence in the foregoing quotation refers to the author's asserted contradiction between the provisions of § 5(b) of the Act, (which prohibits a custodian of public records from inquiring into any matters apart from the identity of the person requesting the records and the identity of the records he seeks) and the Court's statement that:

[T]he particular interest of the requestor, and the purposes for which he seeks the information, are not to be considered in determining whether the matter requested is of legitimate concern to the public, *except insofar as the requestor's interest in the information is the same as that of the public at large.*

540 S.W.2d at 685 (emphasis added). The author's complaints are made colorable by certain phrases used in the Court's opinion, including the statement

. . . the Legislature has also recognized in Section 3(a)(1) that, in some instances, the individual's interest in confidentiality may *outweigh* the public's interest in disclosure.

*Id.,* (emphasis added). I believe, however, that the author loses sight of the thrust of this part of the Court's opinion, which is a reference to the tort law concerning invasions of privacy, specifically the publication of highly personal or embarrassing facts about a plaintiff, and the element of a lack of a "legitimate public interest" which forms a necessary part of that particular privacy tort. The reference was required of the court in order to determine if, under applicable "judicial decisions," publicity of the information would constitute a tort—if so, then the exception set forth in subsection 3(a)(1) would apply, otherwise, the exception would not apply and the information would have to be disclosed.

And because the author lost sight of this fundamental aspect of the Court's opinion, his criticisms are invalid. For example, the Court could not more emphatically have stated that "the Act makes clear that the motives of the individual requestor *are not relevant to the determination of whether the information requested is 'public information.'* " 540 S.W.2d at 685 (emphasis added). The author's reference to the "balancing test" which the court ordered the trial court to employ also reflects that the author misunderstood the Court's meaning. The author considers that "test" to be a "weighing" of the antagonistic interests, that is, the individual's interest in confidentiality against the public's interest in disclosure, whereby the court must rule for or against disclosure according to which interest predominates in importance, which is to say, the exception in § 3(a)(1) applies or it does not according to whether one interest outweighs the other, however slightly. Instead, the Court holds that *there is no tort at all,* of the kind designated to compensate for an injury to one's right to be free from public disclosure of embarrassing private facts, if *any* legitimate public interest exists. And because the applicable "judicial decisions" at common law would not consider that there had been a tort if any legitimate public interest exists, then no "judicial decision" would be applicable to prevent disclosure because of the exception provided in § 3(a)(1). See Restatement of Torts (Second) § 526D, comment. And because the author misinterprets the "test" referred to by the Court, he is led into further error in his contention that the Court did not "adequately define the public interest" relevant to applying the "test" he attributed to the Court. It was not necessary for the Court expressly to define the "public interest" to which it referred, for by initially classifying the tort of which it wrote, that is, an invasion of one's right to be free from public disclosure of embarrassing private facts, the

1. Constitutional law is an external source of law which § 3(a)(1) incorporates into the Act, with the result that information protected from public disclosure under the Constitutions of the State of Texas or the United States is excluded from the mandatory disclosure provisions of the Act; however, the exclusion provided by § 3(a)(1) of the Act is coextensive with the constitutional right relied upon for confidentiality, and in the case of the constitutional right of privacy, that right is presently limited under the relevant judicial decisions to matters "relating to marriage, procreation, contraception, family relationships, or child rearing and education." Because the information sought by the Foundation did not include such information, nor information which, if disclosed, would impinge upon a claimant's constitutional right to freedom of association, the Court held that the requested information "is not excepted by § 3(a)(1) as information deemed confidential by constitutional law." 540 S.W.2d at 681. Similarly, the information which appellees seek to have disclosed in this case does not fall in any of these categories; thus there is no basis for holding this information to be excepted from compulsory disclosure under § 3(a)(2) by reference to constitutional law as delineating the law of privacy.

2. The reference to "judicial decision" in § 3(a)(1) of the Act does *not* reflect a legislative intent that the courts of the State create exceptions to mandatory disclosure on a case-by-case basis "by balancing in each case the interest in privacy against the interest in disclosure, thus creating a common-law privacy doctrine which would except the information involved by judicial decision—thereby allowing courts in their "discretion to deny disclosure *even though there is no specific exception provided" in the Act* which would exclude from mandatory disclosure the particular records sought from a government body in the case then before the court. *Id.* at 681–82 (emphasis added). In this portion of the court's opinion, it rejected the Board's contention that the words "judicial decision" referred to decisions in which the court would except information from disclosure as it saw fit by application of a balancing test. The court noted that the Freedom of Information Act, 5 U.S.C.A. § 552(b)(6) (1976 and Supp.1981), which excludes from mandatory disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy; . . .", *does require* such a balancing test on a case-by-case basis, whereby in cases involving the right of privacy "the individual's right of privacy [is balanced] against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny' . . .," citing *Rose v. Department of the Air Force,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). With respect to the Texas Open Records Act, however, the Supreme Court of Texas observed that the same construction, if applied to § 3(a)(1) of the Texas statute, would render superfluous § 3(a)(2) of that statute in mat-

Court *necessarily* defined the "public interest" as being the public interest applicable to that kind of tort under applicable "judicial decisions." When we refer to the judicial definition of that kind of tort, we find that the "public interest," whose absence of which is necessary to the very existence of the tort is, in reality, only "general interest" or "newsworthiness," the latter being somewhat misleading:

> The "newsworthiness privilege" as it has been called, provides broad protection for publication of what might otherwise appear to be embarrassing private matters. But the term "newsworthy" is a misnomer. Protection is not limited to publication of "news"; it is afforded for dissemination of anything within the outer boundaries of legitimate

public interest or concern. The term "general interest" is therefore more accurately descriptive.

It is also misleading to speak of the protection as a "privilege." Lack of general interest (or "newsworthiness") is an element of the tort itself; it is central to establishment of a "private facts" cause of action that the plaintiff prove that the facts disclosed are not relevant to a matter of general interest. The purpose of the tort is to prevent or provide compensation for *unwarranted* publication of embarrassing information. In other words, information of legitimate public interest, for purposes of the tort, is not legally "private."

R. Sack, *Libel, Slander, and Related Problems,* 409–10 (1980).

ters of personnel-file privacy. The Court thus implied in the strongest terms that the balancing test to which it referred would be applicable under § 3(a)(2), but not applicable outside that subsection. 540 S.W.2d at 681.

3. The term "judicial decisions" refers to judicial decisions at common law, a source of law *external* to the Texas Open Records Act which § 3(a)(1) incorporates into the Act, with the result that information protected from public disclosure under such decisions is excluded from the mandatory disclosure provisions of the Act; however, the exclusion provided by § 3(a)(1) of the Act is coextensive with the judicial decisions relied upon, and in the case of judicial decisions which acknowledge and implement the common law right of privacy by providing a tort action, "four distinct torts, *each subject to different rules,*" are recognized:

1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
2. Public disclosure of embarrassing private facts about the plaintiff.
3. Publicity which places the plaintiff in a false light in the public eye.
4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

540 S.W.2d 681 (emphasis added), referring to the categorization recited in William L. Prosser, *Privacy,* 48 Cal.L.Rev. 383, 389 (1960). The interest asserted by the Board as a basis for nondisclosure under § 3(a)(1) of the Act "most closely resemble[d] the interest defined by Prosser as freedom from public disclosure of embarrassing private facts." *Id.* Under the *rules* applicable to the tort action provided to vindicate *that particular interest,* there is no tort at all unless (1) publicity is given to matters concerning the plaintiff's private life, (2) the publicity of such matters would be highly offensive to a reasonable person of ordinary sensibilities, and (3) there is no legitimate public interest in the matter publicized. *Id.* Since the evidence established that the information sought by the Foundation *did*

contain highly intimate or embarrassing facts about *some* claimants, "such that its publication would be highly objectionable to a person of ordinary sensibilities," the case would be remanded to the trial court to determine on a case-by-case basis which files contained such information; and with respect to them, it would be presumed that the public had no legitimate interest in the information "unless the [Foundation] can show that, under the particular circumstances of the case, the public has a legitimate interest in the information notwithstanding its private nature." *Id.* at 685. With reference to the "publicity" element of that tort, the court observed that merely making the information available for public inspection will establish that element because the State may not constitutionally suppress truthful information contained in public records by prohibiting further publication or distribution thereafter. *Id.* at 684.

How then do the foregoing principles, taken from *Industrial Foundation,* bear upon the present case?

It is readily apparent that any reference to "judicial decisions" as a source of the law of personal privacy must be distinctly different under § 3(a)(1), as compared to such a reference when it is made under § 3(a)(2). When the reference is made under the former subsection, and its explicit *incorporation* of a "judicial decision" at common law as a statutory ground for excluding information from mandatory disclosure, the purpose of the reference is to discover the rules laid down in such decisions; and, having ascertained such rules, they may then be applied to determine whether or not the information is "deemed confidential" for the purposes of the Act. (*See Industrial Foundation,* at 682–85, wherein the Court refers to the judicial decision in *Billings v. Atkinson, supra;* and, having made the reference, the Court determined that the relevant rules have not been as yet precisely formulated with respect to the one relevant privacy tort shown by the evidence in the case—public disclosure of embarrassing private facts about the plaintiff—but the elements could be ascertained by reference to

§ 117 at 809 of Prosser, Law of Torts (1971). The Court concluded that *if the elements of that tort would be established by disclosure of the information* demanded by the Foundation under the Act, the information was excepted from mandatory disclosure on authority of § 3(a)(1). 540 S.W.2d at 682–83.)

In contrast, § 3(a)(2), in its allusion to individual privacy and personnel files, necessarily implies that we refer to other sources of the law of privacy, not for the purpose of ascertaining the operative rules for determining whether a tort would result from disclosure of the requested information, but rather for the purpose of identifying those *interests* which are protected under the legal principle of personal privacy; and if any protected privacy interest of an individual is exposed to harm by release of information contained in personnel records maintained by the State, then we must compare such expected harm against the general purposes of the Act in order to determine whether, in a specific case, the principle of personal privacy or the principle of freedom of access to governmental information is predominant, and rule accordingly. This is, in fact, the procedure, impliedly approved by the Court in *Industrial Foundation*, 540 S.W.2d at 681.[4]

In the foregoing sense, then, we may refer to *Billings v. Atkinson, supra,* to identify the various interests protected by the common law of privacy, no other source of law being applicable to the case. Based upon the contentions of the parties and the witnesses' description of the information sought by appellee, I conclude: (a) there is no threat of an appropriation of any individual's name or likeness; (b) there is no threat of intrusion ˙upon any individual's seclusion, solitude, or into his private affairs, owing to the absence of the element of *direct* intrusion described in W. Prosser,

---

**4.** Disclosure under subsection 3(a)(2) is required unless such action would be "clearly unwarranted." The plain meaning of the term "clearly unwarranted" implies in the strongest possible terms that the decision to disclose the information depends upon a balancing test, leaving the question to be what factors the Legislature intended should be balanced one against the other in making the decision that disclosure is not "clearly unwarranted," a matter to be discussed below.

The Court tacitly recognized in *Industrial Foundation,* at 681, that § 3(a)(2) required on its face a balancing test, for the Court refused to incorporate such a test into § 3(a)(1) because the two provisions were different in scope and operation:

> Absent such a provision [as § 3(a)(2) ], we do not believe that a court is free to balance the public's interest in disclosure against the harm resulting to an individual by reason of such disclosure.

The clear implication of this statement by the Court is that a balancing test *is* required within the category of documents specified in § 3(a)(2).

I have set out in the text my opinion that the Legislature intended to balance personal privacy interests against the general purposes served by the Act. Appellants contend that another factor should be considered, which is the State's interest in confidentiality of personnel records, an interest separate and apart from the privacy interest of the individual employee. Appellants contend that the State's interest lies in being able to deal with prospective employees on a confidential basis in order that it might obtain the highest quality employees, for employees of that quality will consent to negotiate for possible employment only if assured of confidentiality. There is support for this proposition in the evidence. Moreover, appellants contend that the Legislature, in its promulgation of subsection 3(a)(2), anticipated the State's interest would be implemented through the privacy rights of the individual which are patently protected from harm by subsection 3(a)(2). I am, however, unable to attribute this intention to the Legislature on any basis apart from simply assuming it to be true. And within the text of the Act, I find that the Legislature, when it intended to protect the State or public interest in confidentiality, specifically and expressly provided such protection by providing an exception to mandatory disclosure. *See, e.g.,* §§ 3(a)(3), (4), (5), (6), (7), (8), (11), (12), and (16). Our attention has not been invited to any authority for the proposition advanced by appellants.

While the arguments made by appellants in favor of confidentiality in such matters have obvious merit, our task is that of ascertaining the intention of the Legislature in its enactment of the Texas Open Records Act. I find no ambiguity in that statute relative to the matters raised in the appeal now before us. Appellants' arguments would, therefore, be more properly addressed to the Legislature, together with any pertinent amendments to the Act they consider appropriate.

Law of Torts, § 117, at 807–09 (1971); (c) there is no threat of public disclosure of embarrassing facts about any individual, for it is not contended that the information sought by appellee contains facts of that character, as described in Prosser, *supra,* at 809–12 and as referred to by example in *Industrial Foundation* at 683: injuries from sexual assault of a female employee, a claim in behalf of illegitimate children, claims for injuries to sexual organs, and so forth.

I conclude differently, however, with respect to the threat of publicity which may place one in a false light in the public eye. The existence of a cause of action for invasion of this privacy interest has been recognized in *Gill v. Snow,* 644 S.W.2d 222, 224 (Tex.App.1982, no writ). It is this privacy interest, in my view of the undisputed evidence adduced at trial, that will be harmed if we compel disclosure of the names and qualifications of the 400 individuals.

The testimony given at trial is described by example in footnote 1. In § 117 of Prosser's treatise, to which we have referred earlier, are listed various examples of when a defendant may be held liable for publicity which places the plaintiff in a false light in the public eye. Among such examples are: the defendant's filing suit in the plaintiff's name without authorization; the defendant's publicizing that the plaintiff is a candidate for public office when he is not; the defendant's act in entering the plaintiff as a candidate in a popularity contest of an embarrassing kind, when he did not authorize it; and similar actions. Prosser also notes the similarity of the privacy action to one in defamation, one definition of which addresses harm to the plaintiff's relational interests:

> A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Restatement of Torts (Second) § 559 (1965). *See also* § 573 of the same Restatement:

> One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, whether honorary or for profit, is subject to liability without proof of special harm[;]

and *Harang v. Aetna Life Ins. Co.,* 400 S.W.2d 810 (Tex.Civ.App.1966, writ ref'd n.r.e.), which holds that an insurance company may be held liable for defamation and interference with a dentist's practice when the company legitimately gathers information about the dentist's improper charges for dental services, which resulted in excessive payments by the company, but turns the information over to a local dental society which causes the society to revoke the dentist's membership and his right, as a member, to have his patients admitted to a hospital. Despite the kinship of the tort of invasion of privacy to that of defamation, the Restatement of Torts (Second) makes it clear that in the former action the false communication need not amount to defamation, for in § 652E actionable communications of the former kind are defined as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Whatever the particulars of one's complaint may be, when he contends he has been placed in a false light in the public eye, there must be objective substance to his claim and not merely personal annoyance.

> It seems clear, however, that it must be something that would be objectionable to the ordinary reasonable man under the circumstances, and that, as in the case of disclosure, the hypersensitive individual will not be protected.

Prosser, Law of Torts, *supra,* at 813.

The issue reduces initially to whether disclosure of the names and qualifications of

the 400 individuals considered by the search advisory committee and its staff will amount to publicity which places these individuals in a false light in the public eye in a degree which would be highly offensive to a reasonable person. If they are so placed in a false light, it may only be by way of innuendo, for presumably nothing will be false with respect to the information which is disclosed. I believe, however, that the release of their names and qualifications, in light of the purpose for which such information was gathered, will falsely imply, even if by innuendo, that these 400 individuals sought, consented, or allowed themselves unsuccessfully to be considered for the vacant office of president, for under the evidence most did not apply for the position and did not know they were being considered. The harm which these individuals might personally sustain as a result of the disclosure, that is, the harm which under the undisputed evidence they will sustain in their present offices, occupations, professions, or employment, will, under the undisputed evidence, be a harm that is highly offensive to a reasonable person, and will be sustained whether or not they disclaim any interest in the vacant position. In my view, however, those individuals who affirmatively applied for the position by written applications to the Board of Regents, the search advisory committee, or its staff, stand in a different position. While the innuendo remains the same, it is obviously not false in their case, for they *did* consent to being considered for the vacant office. It therefore may not be said that they will be placed in a false light if their names and qualifications are disclosed. And perhaps it may be shown that the innuendo is not false with respect to others of the 400 as well.

Against the privacy interests of the 400 individuals, that is, the harm that they will suffer as a result of disclosure of the information requested, attended by the innuendo which will result from such disclosure, one must balance the public's interest in disclosure, which under subsection 1 of the Act is apparent from the stated policy in favor of making available to the public "*full and complete* information regarding the *affairs of government* and the *official acts* of those who represent them as public officials and employees." (emphasis added)

The privacy interests of the 400 individuals have been sufficiently described heretofore, and it remains to define the public's interest in disclosure in the specific context of the present case. Appellee contends that the public has an acute interest in the procedure by which the President of a leading State university is selected. This public interest is obvious and admitted. One should observe, however, that appellee invokes that public interest merely to heighten or augment the somewhat narrower public interest with which we are more immediately concerned, that is, the public's interest in disclosure under the Act of the particular information involved in this case, against which we are to compare the privacy interests of the 400 individuals. In the present case, I find the public interest to be considerably attenuated, even when augmented in the respect suggested by appellee. For example, the Texas A & M University system does not work directly through public opinion but through the official acts of the Board of Regents of that System. Tex. Educ.Code Ann. § 85.11 (Supp.1975). It is immediately apparent that the information sought by appellee concerns only the most preparatory or preliminary aspects of an examination or screening process, that is, information gathered initially for and at the request of the Board for use by them in subsequently arriving at a decision. Admittedly, the narrowing of the list of 400 individuals to 35 results from official acts and undoubtedly the entire procedure falls within the category of "affairs" of government; still the public interest must be viewed in the light of the inherent nature of the information sought by appellee. When the public interest in disclosing the documents is viewed in that light, I would find the privacy interests of the 400 individuals carry the greater weight, for under the undisputed evidence they will sustain actual and substantial harm, of a kind highly offensive to a reasonable person, by disclosure of the documents as compared to the pub-

lic's rather speculative and insubstantial interest in knowing who was initially suggested or considered for the position.

Accordingly, I would hold that appellee is only entitled to disclosure of the names and qualifications of those of the 400 individuals who applied in writing for the vacant position, or who affirmatively volunteered or allowed themselves to be considered for the position, but not entitled to the names and qualifications of the remainder. I would reverse the judgment of the trial court and remand the case to that court for a determination, on a case-by-case basis, whether the information sought by appellee contains the names and qualifications of any individuals who applied in writing for the office of president, or otherwise caused or allowed themselves to be considered, and for the entry of an appropriate order compelling disclosure in those instances only.