United States Court of Appeals,

Fifth Circuit.

No. 91-2763.

Elvis E. JOHNSON, Plaintiff-Appellee,

v.

Robert SAWYER, et al., Defendants,

United States of America, Defendant-Appellant.

March 16, 1995.

Appeal from the United States District Court for the Southern District of Texas.

Before POLITZ, Chief Judge, KING, JOHNSON, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA and DeMOSS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

In this Federal Tort Claims Act (FTCA)[1] suit, Elvis Johnson (Johnson) was awarded a ten million dollar judgment against the United States for the issuance by Internal Revenue Service (IRS) personnel of two press releases concerning Johnson's recent conviction for filing a false and fraudulent federal income tax return contrary to 26 U.S.C. § 7201. Johnson claimed, and the district court found, that issuance of the press releases violated 26 U.S.C. § 6103(a)(1), which proscribes disclosure of tax return information by federal employees, and caused him to lose his job as the senior executive vice president of American National Insurance

---

[*]Judges Benavides, Stewart, and Parker were not members of the Court when this case was submitted en banc and did not participate in this decision.

[1]28 U.S.C. § 1346, 2671-2680.

Company, one of the largest life insurance companies in the United States. *Johnson v. Sawyer,* 760 F.Supp. 1216 (S.D.Tex.1991). *See also id.,* 640 F.Supp. 1126 (S.D.Tex.1986). On the government's appeal, a divided panel of this Court affirmed the determination of liability. *Johnson v. Sawyer,* 980 F.2d 1490, 4 F.3d 369 (5th Cir.1993).[2] We voted the case en banc, and now reverse. The panel majority held that the issuance of the press releases violated section 6103(a) and that this violation established the FTCA required liability under local law, either under the Texas invasion of privacy tort, which denounces the public disclosure of embarrassing private facts about another, although none of the facts so disclosed were private, or under the Texas negligence *per se* doctrine. We reject the reasoning of the panel majority, because it ultimately grounds the duty not to disclose on federal law, and under the FTCA recovery may only be had on the basis of local law, here that of Texas.

## Facts and Proceedings Below

*Factual Context*

Johnson, a long-time American National executive, was assigned to its headquarters in Galveston, Texas, in 1972, and he and his wife bought a home there at 25 Adler Circle one or two years later. By 1976 he had become senior executive vice president and a member of American National's board of directors. The board varied in size from ten to twelve members. By the time of the events in

---

[2]The panel reduced the economic damages award from $5,902,117 to $5,075,857, and remanded the $5,000,000 noneconomic damages award for further findings.

issue, Johnson had become the company's number two executive, second only to the president, and both he and the president reported directly to the board. In the late 1970s, the IRS began detailed examination of the income tax returns of Johnson and his wife for the years 1972 through 1975. The examining agent referred the matter to the IRS Criminal Investigation Division, which ultimately assigned it to Special Agent Robert Stone (Stone). Following the criminal investigation, the Department of Justice reviewed the matter and recommended prosecution for tax evasion for the years 1974 and 1975 under section 7201, which then provided for a maximum prison term of five years and a $10,000 fine for "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title." The case was assigned to Assistant United States Attorney Powers.

Johnson had kept the company lawyers, the president, and one or two other directors informed of his problems with the IRS. He was also represented by his own counsel. On January 9, 1981, Powers wrote Johnson's lawyer that the Department of Justice, after review by its Tax Division, had directed that an indictment be sought against both Mr. and Mrs. Johnson. On February 4, 1981, Powers again wrote Johnson's attorney stating that he planned to seek an indictment of Mr. and Mrs. Johnson under both section 7201 and 26 U.S.C. § 7206(1) (filing false return), but that if Johnson pleaded guilty to a one-count section 7201 information the government would forego prosecution of Mrs. Johnson and would recommend a probated sentence. A February 13, 1981, letter from

Johnson's lawyer to Johnson stated that Powers and the lawyer agreed they would seek the district judge's authorization to have a presentence investigation performed before charges were filed, which would "involve contacts with ... a select group of individuals to find out whether you are a good citizen." The letter also references "fifty or so statements" that had been submitted to the government on Johnson's behalf. After the presentence investigation report (PSR) was reviewed, there would be a meeting with the judge to discuss probation and an offer to enter a *nolo contendere* plea. After the meeting with the judge, they would decide whether "we would rather try the case." The plea would be entered about 5:00 p.m. some afternoon, to a one count information.

By March 18, 1981, Johnson and his counsel had filed with the court consents to institution of the presentence investigation, and the PSR was ultimately delivered to the district court on April 2, 1981. On March 31, 1981, Johnson's counsel wrote the district clerk "Re: E.E. Johnson" confirming that "this captioned matter" would be heard "Friday, August 10, at 4:00 p.m. in the courtroom in Galveston," Texas. On April 3, 1981, Johnson's attorney wrote Powers stating that "we request" that the information be filed at the time of the hearing, that the waiver of indictment and the "Plea Bargain Agreement" would "be filed at the same time," and that "the "Defendant's Information Sheet' prepared by your office reflect Mr. Elvis Johnson's address c/o 28th Floor, 1100 Milam Street, Houston, Texas 77002, which is our office address." This

4

letter also enclosed "a proposed information." In that document, the defendant is said to be "Elvis Johnson, A/K/A "Gene' Johnson," and no reference is made to the defendant's address.

At approximately 4:00 p.m. Friday, April 10, 1981, Johnson's lawyer and Powers met with the district judge in his office. When they came out, Johnson's lawyer informed him that the judge would not accept a *nolo contendere* plea. Thereafter, at 4:10 p.m. proceedings on the record were commenced in open court in the Galveston federal courtroom before the district judge. Johnson signed and filed a waiver of indictment.[3] An information was filed charging Johnson as follows:

> "That on or about April 15, 1976, in the Southern District of Texas, the defendant ELVIS JOHNSON, a resident of Galveston, Texas, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States for the calendar year 1975, by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed, in the Galveston Division of the Southern District of Texas a false and fraudulent income tax return, which was filed with the Internal Revenue Service, wherein he stated and represented that his taxable income for said calendar year was $53,589.00 and that the amount of tax due and owing thereon was the sum of $18,374.50, whereas, as he then and there well knew, his taxable income for 1975 was $59,784.18 upon which said taxable income he owed to the United States an income tax of $21,849.47. (Violation: Title 26, United States Code, Section 7201)."

Johnson then also signed and swore to a written "Plea of Guilty," also signed "approved" by Powers, which was then filed. This

---

[3]The waiver recites that Johnson is accused of violating both section 7201 and section 7206(1).

There was also filed at that time the "Defendant Information" sheet (form AO-257) listing the defendant as "Elvis Johnson" and showing his address as "1100 Milam St., 28th Floor, Houston, Texas 77002."

5

document concludes by stating:

> "After consulting with my attorney, I have entered into the following agreement, in the nature of "plea bargaining' with the United States Attorney to this effect, and no further:  In the event I enter a plea of guilty to this Information, I will not be prosecuted for violation of Title 26, for the year 1974.  Further, Mrs. Johnson will not be prosecuted for either of the years 1974 or 1975.  Finally, the Government will not oppose a probated sentence."[4]

Being informed that Johnson desired to plead guilty, the district court (Judge Gibson) advised Johnson of his rights, examined him and his counsel in accordance with FED.R.CRIM.P. 11 to insure that the plea was entirely knowing and voluntary, ascertained that the terms of the plea agreement were as above set out, had Powers recite the factual basis of the offense,[5] and had the information read in full.  On inquiry of the court, Johnson stated that he pleaded "guilty," and the court accepted the plea. After Johnson and his counsel declined the court's invitation to

---

[4]The written "Plea of Guilty" also recites "I have received no promises of leniency, or of any other nature, from my own attorney, from the attorney of the United States, or from any other person to induce me to plead guilty" and "I have received no threat of a more severe sentence, of harsh treatment, or of any other nature to induce me to plead guilty" and "I understand the elements of the offense, and I am entering this plea of guilty ... because I am guilty."

[5]The factual basis was as follows:

> "During the year in question, the Defendant attempted to evade a substantial amount of tax that was due to the United States.  This attempt was willful and was accomplished by a filing of an income tax return that the Defendant knew was not correct in that it did not report all of the income earned by the Defendant on his tax return.  At the time the Defendant signed the income tax return, his actions were knowing and willful with respect to the year 1975."

6

say anything about sentencing or the PSR,[6] the court proceeded to sentence Johnson to six months' confinement with execution of the sentence suspended for a one-year probationary period. The court stated on the record that the probation would be "supervised," but the supervision would be relaxed so it would "not interfere with the performance of your duties as an executive for the American National Insurance Company."[7]

On Monday, April 13, 1981, Stone, who was stationed in Houston and had talked to Powers on the telephone concerning what happened at the courthouse on Friday, called Sally Sassen (Sassen), the IRS District Public Affairs Officer who was based in Austin,[8] and gave her information to prepare a press release. Based on what Powers told her, Sassen drafted a release and called Stone and read it to him and he approved it.[9] Sassen also cleared the release with

---

[6]The court had previously stated that "the court is going to follow the recommendation of the government, and that probation will be accorded you."

[7]Shortly thereafter, at 4:35 p.m., the open court proceedings concluded. On April 13, 1981, the written judgment of conviction and sentence was filed, showing, *inter alia,* the full name of Johnson's counsel. On July 24, 1981, the transcript of the April 10, 1981, proceedings was filed. The transcript also reflects, *inter alia,* the full name of Johnson's counsel (and the name of his firm, which includes his last name) and his office address, "20th Floor, 1100 Milam Street, Houston, Texas" (contemporaneous correspondence in the record plainly indicates that "20th" is a misprint for "28th").

[8]The IRS Austin District then included Houston and Galveston.

[9]Stone testified by deposition (he did not testify in person) that after Sassen read him the proposed release, he called Powers and cleared it with him and then called Sassen and told her he had done so. The district court (Judge Singleton) expressly disbelieved Stone's testimony that he had cleared the

7

Stone's superior in Houston.  Sassen then mailed the press release

to twenty-one media outlets in the Galveston area later that day.

It read as follows:

> "INSURANCE EXECUTIVE PLEADS GUILTY IN TAX CASE
>
> GALVESTON, TEXAS—In U.S. District Court here, Apr. 10, Elvis E. Johnson, 59, plead [sic] guilty to a charge of federal tax evasion.  Judge Hugh Gibson sentenced Johnson, of 25 Adler Circle, to a six-month suspended prison term and one year supervised probation.
>
> Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with claiming false business deductions and altering documents involving his 1974 and 1975 income tax returns.
>
> In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest."

On April 14 or 15, the American National comptroller informed

Johnson that a Galveston journalist had called the American

National public relations director to inquire about Johnson's

conviction.  A copy of the release was procured and furnished to

Johnson, who called his lawyer, who in turn called Powers on April

15.  A recording of their telephone conversation reflects that

Powers denied any knowledge of the press release, assumed the IRS

was responsible, and said "[i]f they damaged your client in any

way, sue the hell out of them as far as I'm concerned."[10]  Johnson's

_____

release with Powers.  Sassen testified, without contradiction, that Stone told her he had checked the release with the United States Attorney.

[10]As reflected by the recording, Johnson's lawyer complained of the release "saying that Johnson for '74 and '75 has been charged with altering a bunch of documents" and "putting matters in the release that are matters that aren't covered by the public record."  Johnson's lawyer also then said to Powers "I was of the view that you guys wouldn't have made such a release," to which

lawyer then called and wrote the IRS.  As a result, the IRS informed the media outlets to which it had sent the release that it might contain errors and asked them to put a hold on it.  The IRS then procured a copy of the information to which Johnson had pleaded, and on April 17, 1981, issued to the same outlets a new press release as follows:

"INSURANCE EXECUTIVE PLEADS GUILTY IN TAX CASE

GALVESTON, TEXAS—In U.S. District Court here, Apr. 10, Elvis E. Johnson, 59, plead [sic] guilty to a charge of federal tax evasion.  Judge Hugh Gibson sentenced Johnson, of 25 Adler Circle, to a six-month suspended prison term and one year supervised probation.

Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with willful evasion of federal tax by filing a false and fraudulent tax return for 1975.

In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest."

This release was the same as the earlier one except that the words in the second paragraph of the release describing what the criminal information charged Johnson with were changed from "claiming false business deductions and altering documents involving his 1974 and 1975 income tax returns," in the first release, to "willful evasion of federal tax by filing a false and fraudulent tax return for 1975" in the second release.

Johnson testified that when he returned from court on April

Powers responded, "[w]ell, we never make a release.  Well, I say we never make a release, that's not true.  No we didn't make a release in that case."

Neither Powers nor Johnson's lawyer testified at trial, by deposition or otherwise.

9

10, he called the president of American National and told him what had happened. The president told Johnson they would talk Monday morning, April 13, which they did at about 8:00 a.m. The president expressed his confidence in Johnson, and said it was best for the company for Johnson to remain in his position. When Johnson received a copy of the press release on April 14 or 15, he took it to the president and told him he, Johnson, should go to the board of directors and explain the situation. The president replied, "Why don't you let me handle it. I can do it in a more personal way and I will make sure the board understands about it." At this time, Johnson testified, "we didn't have a board meeting coming up for a few days." Johnson said he heard nothing further from the matter until Saturday afternoon, which would have been April 18, when the president called and then came by Johnson's house and told him he, the president, had visited with two of the directors, telling one of them "about the news release" and "in essence what it said." This director's reply, according to what the president told Johnson, was "well, did you get his resignation on the spot?" Johnson further testified that the president then told him "I guess that's why what I am asking you for right now is your resignation." On Monday, April 20, Johnson resigned from American National's board and from his position as its senior executive vice president. He was assigned to its Springfield, Missouri, office, as assistant regional director for the region including Missouri, Kansas, Arkansas, Oklahoma, and part of North Texas. He served there, at considerably diminished compensation, through 1986, at which time

he retired, having reached age 65 during that year.[11]

Johnson testified, without explanation other than as set forth above, that he was "in essence" fired. However, only the board of directors could terminate Johnson, and there is no evidence of any such action by the board. Nor is there any evidence that even a majority of the board was aware of Johnson's conviction before April 22. No one who claimed to be privy to any decision to terminate Johnson testified, nor did anyone who claimed to have learned of any such decision from one who was privy to it. There is no documentary evidence respecting any such decision. Apart from Johnson himself, no present or former American National director, officer, or employee testified.

Johnson further testified:

"Q. At some point you were going to tell the Board that you were a tax felon?

A. It would be in the footnotes of the annual report, sir.

Q. And would have gone out to the board of directors?

A. And to the shareholders.

Q. And to the shareholders. And you were going to do that regardless whether there was a press release?

A. It would have to have been done, yes, sir."[12]

---

[11]American National issued a press release April 21 announcing Johnson's resignation "effective immediately" from the board and his position as senior executive vice president, and quoting the president as saying Johnson "many times expressed his desire to return to Springfield in order to work more directly in life insurance sales."

[12]Johnson's testimony reflects that American National was a publicly held corporation that sent annual reports to its shareholders. When he first came to it in 1951, American National was the 18th largest life insurance company out of some

In his testimony Johnson also asserted that he was not guilty of tax evasion and that he was wholly unaware that any items claimed as business expenses on his return were factually false or overstated. He claimed that in these respects the returns were based on his wife's erroneous recordkeeping, which he had assumed to be correct. His wife testified in essence that her errors were innocent. The district court apparently credited all their testimony.[13]

---

17,000 such companies in the United States and Canada; it had grown substantially since then, had thousands of employees and offices throughout the United States, and had $105 million profits in 1980. His brief describes it as "one of the largest life insurance companies in the United States."

[13] In so doing, the court in effect rejected the government's contention that "this is a matter of res judicata, it's not open to attack." In this respect, the district court clearly erred.

Johnson's section 7201 conviction has never been challenged, much less set aside or modified. The count in the information of which Johnson was convicted alleged that he "*willfully and knowingly* attempted to evade and defeat a large part of the income tax due and owing by him ... for ... 1975" by filing "a false *and fraudulent* income tax return" that showed his taxable income and income tax at specified figures, "*whereas, as he then and there well knew*" the correct said figures were specified amounts, of several thousand dollars, larger (emphasis added). The italicized allegations were not surplusage, for we have consistently held that a conviction under section 7201 requires that the defendant have "acted willfully and knowingly with specific intent to evade his income tax obligations." *United States v. Daniels,* 617 F.2d 146, 148 (5th Cir.1980). *See also United States v. Garber,* 607 F.2d 92, 97-98 (5th Cir.1979) ("a negligent, careless, or unintentional understatement of income" does not violate section 7201; rather, "[t]he Government must demonstrate that the defendant willfully concealed and omitted from her return income which she knew was taxable"). Moreover, the district judge refused to accept a *nolo* plea from Johnson, and, as the government pointed out below, Johnson's written plea, which he signed and swore to in *open* court, stated that he was "entering this plea of guilty ... *because I am*

12

*District Court*

On April 6, 1983, Johnson filed this suit in the court below against Sassen and several other IRS employees asserting that the press releases constituted a disclosure in violation of section 6103(a)(1), which prohibits any federal employee from disclosing tax return information obtained by him in connection with his government service.[14] Recovery was sought on the basis of 26 U.S.C.

---

*guilty*" (emphasis added). Johnson's plea hence cannot be characterized as an "*Alford* " plea. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). In this civil suit by Johnson against the United States, Johnson is clearly estopped from taking any positions inconsistent with his subsisting section 7201 conviction. *Piper v. United States,* 392 F.2d 462, 464-65 (5th Cir.1968); *Tomlinson v. Lefkowitz,* 334 F.2d 262, 264-65 (5th Cir.1964), *cert. denied,* 379 U.S. 962, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965); *United States v. Thomas,* 709 F.2d 968, 972 (5th Cir.1983).

[14]Section 6103(a) provides:

"**(a) General rule.**—Returns and return information shall be confidential, and except as authorized by this title—

(1) no officer or employee of the United States,

(2) no officer or employee of any State, any local child support enforcement agency, or any local agency administering a program listed in subsection (*l* )(7)(D) who has or had access to returns or return information under this section, and

(3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (e)(1)(D)(iii), (*l* )(12), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes

§ 7217, which authorized a damage suit against any person who disclosed return information contrary to section 6103.[15]

_____

of this subsection, the term "officer or employee' includes a former officer or employee."

Section 6103(b)(2) defines "return information" as including:

"(A) a taxpayer's identity, the nature, source, or amount of his income, ... deductions, ... liabilities, ... tax liability, ... deficiencies, ... whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, ... [or] prepared by ... the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense...."

Section 6103(b)(6) states that "[t]he term "taxpayer identity' means the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in section 6109), or a combination thereof."

[15]Section 7217 provided:

"**(a) General rule.**—Whenever any person knowingly, or by reason of negligence, discloses a return or return information (as defined in section 6103(b)) with respect to a taxpayer in violation of the provisions of section 6103, such taxpayer may bring a civil action for damages against such person, and the district courts of the United States shall have jurisdiction of any action commenced under the provisions of this section.

**(b) No liability for good faith but erroneous interpretation.**—No liability shall arise under this section with respect to any disclosure which results from a good faith, but erroneous, interpretation of section 6103.

**(c) Damages.**—In any suit brought under the provisions of subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—

14

(1) actual damages sustained by the plaintiff as a result of the unauthorized disclosure of the return or return information and, in the case of a willful disclosure or a disclosure which is the result of gross negligence, punitive damages, but in no case shall a plaintiff entitled to recovery receive less than the sum of $1,000 with respect to each instance of such unauthorized disclosure; and

(2) the costs of the action.

**(d) Period for bringing action.**—An action to enforce any liability created under this section may be brought, without regard to the amount in controversy, within 2 years from the date on which the cause of action arises or at any time within 2 years after discovery by the plaintiff of the unauthorized disclosure."

Section 7217 was enacted as a part of the Tax Reform Act of 1976, Pub.L. 94-455, Title XII, § 1202(e)(1), 90 Stat. 1687, and was amended in 1978. Pub.L. 95-600, § 701(bb)(7), 92 Stat. 2923.

In 1982, section 7217 was repealed and replaced by 26 U.S.C. § 7431 in legislation providing that "[t]he amendments made by this section shall apply with respect to disclosures made after the date of this Act [September 3, 1982]." Pub.L. 97-248, § 357(c), 96 Stat. 646. Hence, the disclosures at issue here are governed by section 7217 and not by section 7431.

Section 7431(a) provides for a cause of action against the *United States* for disclosure *by federal employees* contrary to section 6103. Section 7431(b) provides for a cause of action against a person who is *not* a federal employee for a disclosure made by such person in violation of section 6103. Section 7431 states in this respect:

"**(a) In general.**—

(1) **Disclosure by employee of United States.**—If any officer or employee of the United States knowingly, or by reason of negligence, discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

15

At approximately the same time, Johnson filed with the IRS an FTCA administrative claim, likewise asserting that the press releases violated section 6103 and that the IRS was negligent in

---

**(2) Disclosure by a person who is not an employee of United States.**—If any person who is not an officer or employee of the United States knowingly, or by reason of negligence, discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against such person in a district court of the United States.

**(b) No liability for good faith but erroneous interpretation.**—No liability shall arise under this section with respect to any disclosure which results from a good faith, but erroneous, interpretation of section 6103.

**(c) Damages.**—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—

(1) the greater of—

**(A)** $1,000 for each act of unauthorized disclosure of a return or return information with respect to which such defendant is found liable, or

**(B)** the sum of—

**(i)** the actual damages sustained by the plaintiff as a result of such unauthorized disclosure, plus

**(ii)** in the case of a willful disclosure or a disclosure which is the result of gross negligence, punitive damages, plus

**(2)** the costs of the action.

**(d) Period for bringing action.**—Notwithstanding any other provision of law, an action to enforce any liability created under this section may be brought, without regard to the amount in controversy, at any time within 2 years after the date of discovery by the plaintiff of the unauthorized disclosure."

16

its supervision of those issuing the press releases. After six months passed without action on the FTCA claim, Johnson filed an amended complaint adding the United States as a defendant and seeking recovery against it under the FTCA.[16] As against the United States, Johnson asserted that the press releases violated section 6103 and that IRS personnel were guilty of negligence and/or intentional misconduct in issuing such releases and in failing to take measures to prevent their issuance. The following were the complained of items of return information allegedly disclosed in the press releases contrary to section 6103:

"A. Plaintiff's age was disclosed;

B. Plaintiff's address was disclosed;

C. It was stated that Plaintiff was charged with false business deductions and altering documents involving his 1974 and 1975 returns. The criminal information that had been filed of record in the court proceeding dealt with the year 1975 and neither the criminal information nor other data in the public record made references to "claiming false business deductions and altering documents.'

D. Plaintiff's position as Executive Vice-President of American National was stated.

E. It was stated that Plaintiff would be required to pay back taxes plus penalties and interest."[17]

Johnson sought recovery from the United States of his actual damages, alleging that he was discharged from his employment as a result of the press releases, and consequently suffered humiliation

---

[16]A second amended complaint named further individual IRS employees, including Stone, as additional defendants from whom recovery was sought under section 7217.

[17]Virtually the same allegations were made in the FTCA administrative claim.

and mental anguish, loss of earnings, and relocation expenses.[18] He also sought to recover punitive damages from the United States.

The parties filed motions to dismiss and for summary judgment. The district court denied the government's motion claiming a want of FTCA jurisdiction, granted Johnson's motion that the press releases violated section 6103 and the government's motion that it could not be liable for punitive damages, and denied all the individual defendants' motions except one relating to the computation of liquidated damages under section 7217(c)(1). *Johnson v. Sawyer,* 640 F.Supp. 1126 (S.D.Tex.1986) (Singleton, J.).

Thereafter, the case against the individual IRS employees was severed, and the FTCA case proceeded to a bench trial following which the district court ordered judgment in favor of Johnson.[19] The district court found that the press releases were issued in

---

[18]The Second Amended Complaint (the final complaint) alleged:

> "As to Defendant United States of America, Plaintiff is entitled to recover judgment for his actual damages for the following:
>
> A. Plaintiff was discharged from his employment as a result of the publication of Exhibit C [the April 13 press release]; such discharge, together with the humiliation and mental anguish sustained by Plaintiff and his family, caused actual damages of $7,500,000;
>
> B. In addition, Plaintiff sustained other and further damages of the nature of relocation expenses and loss of earnings in the amount of at least $1,000,000."

In substance, these were the allegations made in the FTCA administrative claim.

[19]So far as we are informed, the case against the individual defendants remains pending.

violation of section 6103 and caused Johnson to be discharged from his position as senior executive vice president and member of the board of American National. Damages in the amount of $10,902,117 were awarded, of which $5,902,117 were for loss of earnings, pension benefits, deferred compensation, and loss on the sale of his Galveston house, and $5,000,000 was for "loss of position" meaning "the aggregate of luxuries that are the familiar perquisites of members of the corporate elite" and "emotional distress and mental anguish." *Johnson v. Sawyer,* 760 F.Supp. 1216, 1233 (S.D.Tex.1991) (Singleton, J.).

Although the claimed invasion of Johnson's rights was predicated on section 6103, the district court recognized that "an FTCA claim must be based on a state law cause of action." *Id.* at 1224. The court stated that Johnson had advanced four theories of recovery in this respect under Texas law, namely (1) *respondeat superior;* (2) negligent supervision of employees; (3) breach of a confidential relationship; and (4) violation of the right of privacy. *Id.* at 1225.[20]

The district court held for Johnson on *respondeat superior,* stating that "[t]he negligence of Stone and Sassen is clear. Section 6103 created a duty; they breached that duty by engaging in activity that led to the release of information not in the public record," *id.* at 1230 (footnote omitted), and "[w]e hold the

---

[20]The district court also rejected the government's reliance on the discretionary function and tax exceptions to the FTCA, 28 U.S.C. § 2680(a) & (c). *See Johnson,* 760 F.Supp. at 1225-1228. We do not reach and express no opinion concerning these rulings.

19

United States vicariously liable for the negligence of Sassen and Stone." *Id.* at 1231. It also held for Johnson on negligent supervision, noting that because under Texas law negligent supervision is "superfluous" where the employee's offending action was within the course and scope of his employment,[21] therefore "a finding of negligent supervision appears to follow almost automatically from our finding of *respondeat superior* negligence. We hold that the United States was negligent in its supervision of Sassen and Stone ..." *Id.* at 1232.

The court rejected Johnson's invasion of privacy and breach of confidential relationship claims. As to the former, the court noted that under Texas law breach of privacy was divided "into four distinct torts," of which Johnson "pleads only two," namely "public disclosure of embarrassing facts about the Plaintiff" and "false light." *Id.* at 1232. As to the first, the elements, under *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668 (Tex.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977), were that (1) publicity was given to matters concerning the plaintiff's private life, (2) the publication of which would be highly offensive to one of ordinary sensibilities, and (3) the matter publicized is not of legitimate public concern. *Johnson* at 1332. Though "[s]keptical," the district court was unable to find that postconviction press releases do not help to deter prospective tax evaders, and stated

---

[21]The district court cited *Dieter v. Baker Service Tools,* 739 S.W.2d 405, 408 (Tex.App.—Corpus Christi 1987, writ denied), in this connection.

"we cannot, therefore, hold that the identity of those who are convicted of violating the tax laws is not of legitimate public concern." *Id.* The court did not address the other two elements of this tort. As to the "false light" privacy claim, the district court noted that Johnson claimed the press release "[p]laced him in a false light in the public eye, by implying that he had admitted to falsifying deductions and altering documents." The court held this claim barred because "[i]ts essence is injury to Johnson's reputation, and it therefore falls under 28 U.S.C. § 2680(h), which exempts from the FTCA any claim arising from libel, slander or misrepresentation." *Id.*

The district court, citing *Thompson v. Norton,* 604 S.W.2d 473, 476 (Tex.Civ.App.—Dallas 1980, no writ), also rejected the claim of breach of confidential relationship, finding nothing akin to that between attorney/client, partners, or family members, or long-time relations of trust in which one party is justified in relying on the other to act in his best interest. It also rejected the notion that such a "concept embraces relations between a citizen and his government." *Johnson,* 760 F.Supp. at 1233.

The government appealed.

*Panel*

The panel majority, in its initial opinion, *Johnson v. Sawyer,* 980 F.2d 1490 (5th Cir.1992), affirmed the finding of liability on a negligence *per se* theory, reasoning that "the IRS agents' violations of ... the duty established in § 6103 amounted to negligence under Texas tort law," *id.* at 1497, and holding that

21

the district court did not err "in finding that the actions of the IRS agents violated § 6103, and that when such a violation of a statute injures persons whose interests are intended to be protected by the statute, the violation constitutes a tort under Texas law, thereby implicating the FTCA." *Id.* at 1505. Neither Johnson nor the panel addressed the district court's holdings rejecting recovery on the basis of publication of embarrassing private facts about another, false light, and breach of confidential relation.[22] The panel made a reduction in the portion

---

[22]The initial panel majority opinion also rejected the government's argument that Johnson's suit was in contract, not tort, and hence was not covered under the FTCA. See *Paul v. United States,* 929 F.2d 1202, 1204 (7th Cir.1991) ("Claims based on the plea bargain invoke contract, not tort" and hence are excluded from the FTCA); *City National Bank v. United States,* 907 F.2d 536, 546 (5th Cir.1990) (grossly negligent breach of contractual duty excluded from FTCA as contract claim); 28 U.S.C. § 2680(h) (excluding from FTCA claims for "misrepresentation, deceit, or interference with contract rights"). In this connection, the panel majority correctly noted that

> "The government mischaracterizes both Johnson's cause of action and the basis for the district court's judgment. Neither relied on breach of the plea agreement.... [T]he IRS was not even a party to the plea agreement between the Department of Justice [actually, the United States Attorney] and Johnson, and thus had no privity with Johnson. Without privity there can be no breach of contract. Moreover, Johnson never asserted that the government was liable to him because the IRS violated his agreement with the Department of Justice. To the contrary, Johnson has consistently asserted that the government's liability results from violation of its duty toward him as established by § 6103." *Johnson,* 980 F.2d at 1501 (footnote omitted).

*See also id.* n. 42: "The plea agreement specified only that the Justice Department would not issue a press release."

We also observe that neither Johnson's FTCA

22

of the award for lost pension benefits and remanded for further findings the $5,000,000 portion of the award for noneconomic damages from loss of position and associated emotional distress.

The panel majority subsequently issued a "Supplemental and

---

administrative claim nor his second amended complaint make any reference whatsoever to even the existence, much less the breach, of any agreement (or plea agreement) between Johnson and any officer or employee of the United States.

Further, most of what the district court found was "agreed" by "Powers" as "part of the plea bargain," *Johnson,* 760 F.Supp. at 1221, is not a part of the sworn, written "plea of guilty" which purported to state the full extent of the government's obligations (see text at n. 4), and is not supported by any writing. The district court's finding that Powers agreed that "the U.S. Attorney's office would publish no press release" is supported by no writing and the *only* testimony in that respect is the following by Johnson under examination by his own counsel: "Q. And do you recall that he [Powers] agreed, *or at least that I told you* he had agreed to not make a news release? A. That was my understanding, yes, sir." (Emphasis added).

The only record support for the district court's findings that Powers agreed (a) "all papers filed in the case would give plaintiff's name as "Elvis Johnson' rather than "E.E. "Johnny" Johnson,' by which he is normally known" and (b) "papers requiring Johnson's street address would give it as 1100 Milam Street in Houston, which was the address of his attorney, and no reference to his address at 25 Adler Circle, Galveston, would be made," are: (1) Johnson's testimony on direct, when asked of "a plea bargain that we made with Mr. Powers, your recollection," that "my recollection is that I would be referred to as Elvis Johnson, that my address would be shown as 28th Floor 1100 Milam in Houston," and (2) the April 3, 1981, letter from Johnson's lawyer to Powers stating "we request" that "the "Defendant's Information Sheet' prepared by your office reflect Mr. Elvis Johnson's address c/o 28th Floor, 1100 Milam Street, Houston, Texas 77002, which is our office address."

Finally, we note that there is no finding nor any evidence that any IRS employee was aware of any agreement between Powers and Johnson's counsel (or Johnson) not contained in the written "Plea of Guilty" (see text at n. 4 *supra* ), or even of all the terms of that document.

23

Amending" opinion. *Johnson v. Sawyer,* 4 F.3d 369 (5th Cir.1993). That opinion held that "Texas courts have consistently recognized that the existence of a duty is the threshold question in a negligence action," *id.* at 377 (footnote omitted), and that "[i]nstead of creating a duty on the part of the IRS toward Johnson (as found by the district court and as initially found by this panel's majority), § 6103 simply establishes a standard of care applicable to the independently existing duty to refrain from publicizing damaging or embarrassing private facts about another person." *Id.* at 378.[23] The opinion further held that "Texas recognizes an invasion of privacy cause of action for public disclosure of private facts," *id.* at 373, and, despite the fact that Johnson did not so contend before this Court, went on to hold "that the district court erred in not holding for Johnson on his public disclosure cause of action." *Id.* at 376. The panel majority did not modify any of its other previous holdings and ultimately reached the same result as it had originally.

We took the case en banc, thus vacating the panel opinions.

### Discussion

*FTCA Requires Breach of State Law Duty*

The FTCA, subject to several exceptions, waives the sovereign immunity of the United States, making it liable in tort "in the same manner and to the same extent as a private individual under

---

[23]Similarly, the opinion states "[w]e do realize, however, that the district court did err (as did we originally) in stating that § 6103 created a duty when it actually only established a standard of conduct." *Id.* at 392.

24

like circumstances," 28 U.S.C. § 2674, for certain damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*"  28 U.S.C. § 1346(b) (emphasis added).  While as a matter of abstract linguistics the phrase "law of the place where the act or omission occurred" might be thought to include generally applicable federal law, it has long been settled that it does not, and that "the liability of the United States under the Act [FTCA] arises only when the law of the state would impose it."  *Brown v. United States,* 653 F.2d 196, 201 (5th Cir.1981).  Thus, even a violation of the United States Constitution, actionable under *Bivens,*[24] is not within the FTCA unless the complained of conduct is actionable under the local law of the state where it occurred.  *Brown* at 201.

It follows, of course, and has consistently been held, that "the FTCA was not intended to redress breaches of federal statutory duties."  *Sellfors v. United States,* 697 F.2d 1362, 1365 (11th Cir.1983).  As the Second Circuit said in *Chen v. United States,* 854 F.2d 622, 626 (2d Cir.1988):

> "The FTCA's "law of the place' requirement is not satisfied by direct violations of the Federal Constitution, *see Contemporary Mission, Inc. v. U.S.P.S.,* 648 F.2d 97, 104-05 n. 2 (2d Cir.1981);  *Birnbaum v. United States,* 588 F.2d 319, 328 (2d Cir.1978), or of federal statutes or regulations standing alone, *Cecile Indus., Inc. v. United States,* 793 F.2d 97, 100

---

[24]*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

25

> (3d Cir.1986); *Art Metal—U.S.A., Inc. v. United States,* 753
> F.2d 1151, 1157-58 (D.C.Cir.1985); *Birnbaum,* 588 F.2d at 328;
> *Nichols [v. Block],* 656 F.Supp. [1436] at 1444-45 [
> (D.Mont.1987) ]. The alleged federal violations also must
> constitute violations of duties "analogous to those imposed
> under local law.' *Cecile Indus.,* 793 F.2d at 100 (quoting *Art
> Metal,* 753 F.2d at 1158.)"

*See also, e.g., Zabala Clemente v. United States,* 567 F.2d 1140, 1149 (1st Cir.1977) ("... even where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability"); *Gelley v. Astra Pharmaceutical Products, Inc.,* 610 F.2d 558, 562 (8th Cir.1979) ("... federally imposed obligations, whether general or specific, are irrelevant to our inquiry under the FTCA, unless state law imposes a similar obligation upon private persons").

We have long followed this rule. *United States v. Smith*, 324 F.2d 622, 624-25 (5th Cir.1963) (the FTCA "simply cannot apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs" and is unavailable where "[t]he existence or nonexistence of the claim" "depends entirely upon Federal statutes"); *Brown; Tindall v. United States,* 901 F.2d 53, 56 at n. 8 (5th Cir.1990) ("a federal regulation cannot establish a duty owed to the plaintiff under state law," citing *Smith* ). *See also Bosco v. U.S. Army Corps of Engineers,* 611 F.Supp. 449, 454 (N.D.Tex.1985).

This is not to say that the required state law must be one

26

directly applicable to the conduct of federal employees or to the precise activity from which the claim arose. The Supreme Court made this clear in *Indian Towing Co. v. United States,* 350 U.S. 61, 64-65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955), where it held that the United States could be liable under the FTCA for the Coast Guard's negligence in the operation of its lighthouse, asserting "it is hornbook tort law that one who undertakes to warn the public of a danger and thereby induces reliance must perform his "good Samaritan' task in a careful manner." *See also Block v. Neal,* 460 U.S. 289, 293-95, 103 S.Ct. 1089, 1092, 75 L.Ed.2d 67 (1983). Although *Indian Towing* did not expressly refer to state law, subsequent decisions have made plain that in FTCA cases "the application of the "Good Samaritan' doctrine is at bottom a question of state law." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 816 n. 12, 104 S.Ct. 2755, 2765 n. 12, 81 L.Ed.2d 660 (1984). *See also Sheridan v. United States,* 487 U.S. 392, 400-01, 108 S.Ct. 2449, 2455, 101 L.Ed.2d 352 (1988). If the government undertakes to perform a duty, such as to furnish a lighthouse service or direct air traffic, and negligently performs that duty, then it may be liable under the FTCA *if* a similarly situated private enterprise would be liable under the local law good Samaritan rule.[25] We have applied

---

[25]As the Court said in *Sheridan,*

> "By voluntarily adopting regulations that prohibit the possession of firearms on the naval base and that require all personnel to report the presence of any such firearm, and by further voluntarily undertaking to provide care to a person who was visibly drunk and

27

the same theory in FTCA cases involving air traffic controllers. *See Gill v. United States,* 429 F.2d 1072, 1075 (5th Cir.1970).[26]

The teaching of these authorities is that the violation of a federal statute or regulation does not give rise to FTCA liability unless the relationship between the offending federal employee or agency and the injured party is such that the former, if a private person or entity, would owe a duty under state law to the latter in a *nonfederal* context. If the requisite relationship and duty exist, then the statutory or regulatory violation may constitute or be evidence of negligence in the performance of that state law duty.

*Negligence Per Se*

In accordance with the foregoing, in FTCA cases courts have generally refused to find the necessary state law *duty* in an assertedly violated federal statute or regulation merely because

> visibly armed, the Government assumed responsibility to "perform [its] "good Samaritan" task in a careful manner.' " *Indian Towing Co. v. United States,* 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955). "The District Court and the Court of Appeals both assumed that petitioners' version of the facts would support recovery under Maryland law on a negligence theory if the naval hospital had been owned and operated by a private person." *Id.,* 487 U.S. at 401, 108 S.Ct. at 2455 (footnote omitted).

[26]*Gill* was a Texas case. Texas has recognized the good Samaritan doctrine since well before enactment of the FTCA. *See, e.g., Colonial Savings Ass'n v. Taylor,* 544 S.W.2d 116, 119 (Tex.1976). Similarly, in an action between private parties who owe a duty one to the other under general state law, such as the duties owed by a seller to a buyer in respect to the quality of the goods sold, violation of applicable federal law may constitute a breach of that duty under a negligence *per se* concept, just as would violation of state law. *See Gibson v. Worley Mills, Inc.,* 614 F.2d 464, 466 (5th Cir.1980).

28

the law of the relevant state included a general doctrine of negligence *per se.* Thus in *Art Metal—U.S.A., Inc. v. United States,* 753 F.2d 1151 (D.C.Cir.1985), the D.C. Circuit rejected FTCA liability sought to be predicated on a violation of federal regulations, notwithstanding that local law had a broad negligence *per se* doctrine and the plaintiffs were intended beneficiaries of the regulatory provisions violated. The court observed: "[d]uties set forth in *federal* law do not, therefore, automatically create duties cognizable under *local tort law.* The pertinent question is whether the duties set forth in the federal law are analogous to those set forth in local tort law." *Id.* at 1158 (citing *Indian Towing Co.*). This language and holding were cited with approval by the Third Circuit in *Cecile Industries, Inc. v. United States,* 793 F.2d 97, 100 (3d Cir.1986). And, in *Myers v. United States,* 17 F.3d 890 (6th Cir.1994), the court refused to authorize FTCA recovery on the basis of breach of a duty imposed by federal regulations. *Myers* cites *Art Metal* with approval as "characterizing plaintiff's attempt to invoke doctrine of negligence *per se* without establishing an underlying state-law duty as a "mistake' and a "flawed analysis.' " *Myers* at 899.

Where a claim is wholly grounded on a duty imposed by an allegedly violated federal statute or regulation, to allow FTCA recovery merely on the basis of a general state doctrine of negligence *per se,* without requiring that there be some specific basis for concluding that similar conduct by private persons or entities would be actionable under state law, is to in essence

discriminate against the United States:  recovery against it is allowed, although for similar conduct the private person or entity would not be subject to liability under state law.  Plainly, the FTCA waiver of sovereign immunity does not go so far.  To allow section 6103(a)(1) to create the duty allegedly breached merely because Texas generally follows the doctrine of negligence *per se* violates the rule of *Tindall* that for FTCA purposes "a federal regulation cannot establish a duty owed to the plaintiff under state law."  *Id.* at 56 n. 8 (citing *Smith* ).  Accordingly, we hold that the relevant duty not to disclose must be found in Texas law apart from section 6103(a)(1) and the Texas doctrine of negligence *per se.*

Even apart from the foregoing, there is no showing that Texas would create a common law cause of action for violation of section 6103(a)(1), inasmuch as section 7217 provided for a comprehensive private cause of action for any such violation (see n. 15 *supra* ).  While Texas generally recognizes the doctrine of negligence *per se, see El Chico Corp. v. Poole,* 732 S.W.2d 306 (Tex.1987), no Texas decision has been found applying the doctrine to create a common law cause of action for a statutory violation *where* there is a comprehensive and express statutory private cause of action for the statutory violation.  Moreover, in this instance both the statute violated and the statute creating the cause of action for that violation are federal.  We can think of no reason for a Texas court to create a common law cause of action for the statutory violation

30

in such a circumstance.[27]  We have long followed the principle that we will not create "innovative theories of recovery or defense" under local law, but will rather merely apply it "as it currently exists."  *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1217 (5th Cir.1985) (footnote omitted).  *See also, e.g., Junior Money Bags, Ltd. v. Segal,* 970 F.2d 1, 11 (5th Cir.1992);  *Mitchell v. Random House, Inc.,* 865 F.2d 664, 672 (5th Cir.1989);  *Graham v. Milky Way Barge, Inc.,* 824 F.2d 376, 381 (5th Cir.1987);  *Harmon v. Grande Tire Co.,* 821 F.2d 252, 259 (5th Cir.1987).  As there is currently no Texas law creating a common law cause of action for a statutory violation for which violation there is an express and comprehensive statutory cause of action, we will not undertake to ourselves create such a Texas common law cause of action.[28]

---

[27]State as well as federal courts would be available for section 7217 suits, as its grant of federal jurisdiction does not purport to be exclusive.  *See, e.g., Tafflin v. Levitt,* 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990).

[28]Our proper reluctance to take such a step is enhanced by the concern, which would surely be shared by Texas judges, that any such Texas common law cause of action predicated solely on a violation of section 6103(a)(1) might well be preempted by section 7217.  We deal here only with federal employees acting in the course of their employment, and the only portion of section 6103(a) which extends its prohibitions to them is clause (1), which states "no officer or employee of the United States" (clause (2) describes specified state and local governmental employees, and clause (3) speaks to specified "*other* person[s]" (emphasis added), thus *excluding* federal employees).  In *Boyle v. United Technologies Corp.,* 487 U.S. 500, 503-06, 108 S.Ct. 2510, 2514-15, 101 L.Ed.2d 442 (1988), the Supreme Court stated:  "Another area that we have found to be of peculiarly federal concern, warranting the displacement of state law, is the civil liability of federal officials for actions taken in the course of their duty.  We have held in many contexts that the scope of that liability is controlled by federal law."  *See also, e.g., United States v. Demko,* 385 U.S. 149, 152, 87 S.Ct. 382, 384, 17 L.Ed.2d 258 (1966) (federal compensation statute preempts FTCA;  "[t]here

31

*Respondeat superior;  Negligent Supervision*

The district court held that the fact that Stone and Sassen, within the scope of their employment, violated section 6103(a)(1), though not thereby committing a tort under local law, nevertheless sufficed to impose liability on the United States under the FTCA, because Texas follows the doctrine of *respondeat superior* and thus holds private employers liable for the torts committed by their employees in the course and scope of their employment.  So far as we are aware, no other court has adopted this approach in an FTCA case.  We reject it for essentially the same reason we have held that general state law principles of negligence *per se* do not suffice to convert a duty created only by federal statute into one owing under state law for purposes of the FTCA's requirement that liability thereunder be that which would be imposed on a private party by local law.  All states recognize the general doctrine of *respondeat superior,* and did so when the FTCA was enacted;  and, the FTCA itself applies only to the conduct of a federal "employee

_____

is no indication of any congressional purpose to make the compensation statute in 18 U.S.C. § 4126 non-exclusive");  *Rollins v. Marsh,* 937 F.2d 134, 139-140 (5th Cir.1991) (Civil Service Reform Act preempts both FTCA and state law claims);  *Atkinson v. Gates, McDonald & Co.,* 838 F.2d 808, 812-13 (5th Cir.1988) (despite absence of express preemptive language, Longshore and Harbor Workers' Compensation Act remedy for stopping compensation without notice of controversion preempts state law tort action for bad faith practices).  We need not now ultimately resolve the issue of whether Texas could have created a cause of action for violation of section 6103(a)(1) where a comprehensive cause of action for such a violation was provided by section 7217 (nor need we now resolve the analogous issue of whether section 7217 preempts the FTCA).  These substantial preemption concerns are but an additional reason for *us* not to create such a cause of action for Texas when it has not already done so.

... while acting within the scope of his office or employment." Section 2674. All FTCA liability is *respondeat superior* liability. To say that the *only* local law we must look to is that of *respondeat superior* is to in effect render the FTCA's local law component substantially meaningless. *Respondeat superior* does not impose liability on the employer *unless* the employee's conduct has been actionable. *See, e.g., Knutson v. Morton Foods, Inc.,* 603 S.W.2d 805, 807 n. 2 (Tex.1980) ("It is well established that where the employer's liability rests solely on *respondeat superior,* an adjudication acquitting the employee of negligence will stand as a bar to a subsequent suit against the employer"). A private employer is not liable under local law if the complained of conduct of his employee, though within the scope of employment, is not tortious under local law. Under the FTCA, the United States is not liable if the private employer would not be liable pursuant to local law.

The same analysis applies to the negligent supervision theory. This tort came into Texas law by way of analogy to negligent entrustment. *See, e.g., Deerings West Nursing Center v. Scott,* 787 S.W.2d 494, 495-96 (Tex.App.—El Paso 1990, writ denied); *Park North General Hospital v. Hickman,* 703 S.W.2d 262, 265-66 (Tex.App.—San Antonio 1985, n.r.e.). Texas negligent entrustment law clearly requires, *inter alia,* that the accident or occurrence injuring the plaintiff have been proximately caused by the tortious conduct of the person to whom the vehicle (or other instrumentality) was negligently entrusted. *See, e.g., Schneider*

33

*v. Esperanza Transmission Co.,* 744 S.W.2d 595, 596-97 (Tex.1987).

Likewise, in negligent hiring or supervision cases, the general rule is clearly that "liability ... must be predicated upon the wrongful act or omission of the employee at the time of the infliction of the injury complained of ... and, if the employee is guilty of no such act or omission, there is no liability on the part of the employer, however inexperienced, incompetent, and unfit the employee may have been for his task."  53 Am.Jur.2d *Master and Servant* § 422 at 435.  Other courts reach the same result on the basis of "proximate cause," which "requires that the third person must have been injured by some negligent or other wrongful act of the employee so [negligently] hired." *Id.* at 437. *See also, e.g., Texas Skaggs, Inc. v. Joannides,* 372 So.2d 985, 987 (Fla.App.1979).[29]  We are aware of no reported Texas decision to the contrary.  Where liability has been imposed on the employer on a negligent hiring or supervision basis, it has always been where the plaintiff's injury was caused by an employee's conduct that was tortious under Texas law.[30]  No rational law would impose liability

---

[29]There the court held:  "... Florida recognizes negligent hiring, training or retention as legitimate bases of recovery against an employer....  [H]owever, ... in order to impose liability on an employer for such torts, a plaintiff must first show that he was injured by the wrongful act of an employee." *Id.*

[30]Generally, Texas cases have applied negligent hiring or supervision to instances where the employee's wrongful conduct—typically assault on a third person—was not within the scope of his employment, but was nevertheless to some degree job related.  *See Dieter v. Baker Service Tools,* 739 S.W.2d 405, 408 (Tex.App.—Corpus Christi 1987, writ denied).  The doctrine has also been applied to authorize punitive damages against the employer, but, again, only in cases where the plaintiff's injury

on an employer for the nontortious acts of its employee. We decline to adopt any such extension of Texas law. Since a requisite for employer liability under the failure to supervise theory is that the employee's conduct wrongfully invaded the plaintiff's rights, to be actionable under the FTCA that element must be tested under local, not federal, law. Otherwise, the requirement that the liability be such as would result under local law is disregarded.

Neither *respondeat superior* nor negligent supervision justifies FTCA recovery here absent a determination that issuance of the press releases violated Johnson's rights under Texas law.

*Public Disclosure of Private Facts*

The panel majority's second opinion grounded recovery on the Texas tort of "public disclosure of embarrassing private facts about the plaintiff," as recognized in *Industrial Foundation of the Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 682 (Tex.1976). This cause of action requires the plaintiff to prove (1) that the publicized information "contains highly intimate or embarrassing facts about a person's private affairs, such that its publication would be highly objectionable to a person of ordinary sensibilities," *id.* at 683; (2) that such information was "communicated to the public at large," not simply to "a small group of persons," *id.; and* (3) "that the information publicized not be of legitimate concern to

_____

resulted from the employee's tortious conduct. *See, e.g., Estate of Arrington v. Fields,* 578 S.W.2d 173, 175-76, 178-79 (Tex.Civ.App.—Tyler 1979, n.r.e.).

35

the public." *Id.* at 684-85.[31] The Texas Supreme Court in *Industrial Foundation* further expressly held that this tort did *not* extend to publication of facts, no matter how intimate, embarrassing, or otherwise private, which were a matter of open public record, stating: "the State may not protect an individual's privacy interests by recognizing a cause of action in tort for giving publicity to highly private facts, if those facts are a matter of public record." *Id.* at 684. In this connection, as the Texas Supreme Court noted, *id.,* the United States Supreme Court in *Cox Broadcasting Corporation v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975), held that "the First and Fourteenth Amendments command nothing less than that the states may not impose sanctions on the publication of truthful information contained in official court records open to public inspection."[32] Texas clearly has continued to follow the rule that "[o]nce information is made a part of a public record, there can be no liability for publicizing it." *Gill v. Snow,* 644 S.W.2d 222, 224

---

[31]As noted, the district court denied recovery on this basis, made no finding favorable to Johnson on any of the necessary elements, and expressly found that Johnson had not shown that the publicized information was not of legitimate public concern. Prior to the second panel opinion, Johnson had made no complaint before this Court as to these aspects of the district court's decision.

[32]*See also, e.g., Innovative Database Systems v. Morales,* 990 F.2d 217, 221-22 (5th Cir.1993) (Texas law unconstitutional to the extent it prohibits sale of truthful motor vehicle accident information obtained from the public records of a law enforcement agency).

(Tex.App.—Ft. Worth 1982, no writ).[33]

Thus, the proper focus must be on the information contained in the press releases but *not* a part of the public record of Johnson's criminal case. This was correctly identified in the panel majority's second opinion as follows:

> "True, several items contained in the press releases (Johnson's first and last name, the guilty plea to one count of tax evasion, the sentence imposed, and the fact that he was an executive with American National) were part of the trial record. But several other items contained in those releases (Johnson's middle initial—he was known as "E.E', his age, his home address in Galveston, and his official job title with American National) were neither discussed at his arraignment [ ] or sentencing [n]or placed in any public record." *Johnson v. Sawyer,* 4 F.3d at 381 (footnote omitted).[34]

---

[33]The panel majority's second opinion appears to suggest that *Cox Broadcasting* could be limited to publication by "the press," though correctly recognizing that Texas interprets that decision as "extending ... to anyone who publicizes such information." *Johnson v. Sawyer,* 4 F.3d at 374. Of course, Texas law is what is relevant here. Moreover, the language from *Cox Broadcasting* above quoted in the text (at n. 32) is not limited to publication by the press, nor is the rationale of that opinion. Indeed, *Cox Broadcasting* relies in part on comment *c* to the then tentative draft of *Restatement (Second) of Torts* § 652D, stating " "there is no liability for giving publicity to facts about the plaintiff's life which are matters of public record.' " *Cox Broadcasting,* 420 U.S. at 494, 95 S.Ct. at 1045 (incidentally, the quoted language has been incorporated into the final, approved version of comment *b* to section 652D). Nothing in section 652D or its commentary suggests (or suggested) in this respect a different rule for publication by "the press" as opposed to publication by others. Nor are we aware of any case that has so restricted *Cox Broadcasting.*

[34]The panel majority properly did not include in its listing in this respect the statement in the first press release that Johnson "was charged in a criminal information with *claiming false business deductions and altering documents* involving his *1974* and 1975 income tax returns." (Emphasis added). This language, which on its face purports only to describe the content of the criminal information, is not return information under section 6103(a). While this misdescription of the criminal information would be actionable under Texas libel law, it is not actionable under the FTCA, which exempts "[a]ny claim arising out

37

However, none of these items of information—middle initial, age, street address, job title—can be characterized under Texas law as "private" and "highly intimate or embarrassing facts about a person's private affairs, such that its publication would be highly objectionable to a person of ordinary sensibilities." *Industrial Foundation* at 683. Texas invasion of privacy law in this respect has been guided by Prosser, *Law of Torts* § 117 (4th ed. 1971) and *Restatement (Second) of Torts,* § 652D. *See Industrial Foundation* at 682 & n. 21, 684 & n. 22; *Gill* at 224. Prosser, *supra,* states " "[t]he plaintiff cannot complain when an occupation in which he publicly engages is called to public attention or when publicity is

of ... libel, slander, misrepresentation...." Section 2680(h). As the district court correctly recognized, "false light" invasion of privacy essentially amounts to libel, slander, or misrepresentation. In any event, Texas does not recognize the tort of false light invasion of privacy. *Cain v. Hearst Corp.,* 878 S.W.2d 577 (Tex.1994). Finally, there is no finding or evidence that the inclusion of this matter in the first press release (it was omitted in the second, corrected release) caused Johnson to lose his position (or otherwise harmed him).

Likewise, for essentially the same reasons, the panel majority properly did not include in its listing the statement in both press releases that "Johnson will be required to pay back taxes, plus penalties and interest." To the extent that this might be taken to misdescribe the penalty judicially imposed on Johnson, it might be actionable under Texas law as some form of defamation, but would be exempted from the FTCA (if viewed in this respect simply as "false light," it would not in any event be actionable under Texas law). Further, the quoted statement in substance merely describes the known, universally applicable legal consequences of willfully and knowingly filing a false and fraudulent income tax return understating the tax due by several thousand dollars. See 26 U.S.C. §§ 6601 (interest), 6651(a)(3) (penalty), 6653(2) (penalty). Finally, there is, again, no evidence and no finding that the inclusion of this information in the press releases had anything to do with Johnson's loss of position (or otherwise harmed him).

38

given to matters such as the date of his birth....' " *Id.* § 117 at 858. An individual "must expect the more or less casual observation of his neighbors and the passing public as to what he is and does" and thus there is no liability for publicizing "that he has returned home from a visit, or gone camping in the woods, or given a party at his house for his friends." *Id.* at 857. The *Restatement (Second) of Torts,* § 652D, comment *b,* is to the same effect, *viz:* "[t]here is no liability for giving publicity to facts about the plaintiff's life ... such as the date of his birth ... [or] the fact that he is admitted to the practice of medicine or is licensed to drive a taxicab ..." and "there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye." *Id.* at 385, 386. *See also Hubert v. Harte-Hanks Texas Newspapers, Inc.,* 652 S.W.2d 546, 551 (Tex.App.—Austin 1983, n.r.e.) ("We do not regard the candidates' names to be facts of a highly embarrassing or intimate nature"); *Vandiver v. Star-Telegram, Inc.,* 756 S.W.2d 103, 106 (Tex.App.—Austin 1988, no writ); *Ross v. Midwest Communications, Inc.,* 870 F.2d 271, 274 (5th Cir.1989) ("name, residence, or "identity' are not easily characterized as "private, embarrassing facts.' "); *Tobin v. Michigan Civil Service Comm'n,* 416 Mich. 661, 331 N.W.2d 184, 189 (1982) ("Names and addresses are not ordinarily personal, intimate, or embarrassing pieces of information"). *No* Texas (or other) authority to the contrary is cited by the majority. Moreover, there is no evidence whatsoever that Johnson's middle initial, his age, his title at American National, and his

39

home address, or any of these, were actually secret or concealed, or were regarded by him, or would be regarded by the average person, as private or embarrassing or intimate. To the contrary, they were obviously matters that Johnson, in the words of the *Restatement,* "leaves open to the public eye." As to the middle initial, its inclusion in the press release is nowhere complained of in either the FTCA administrative claim or in Johnson's final complaint. Indeed, in his brief below Johnson asserted that "Powers agreed that the criminal information and others papers filed with the Court would identify the Plaintiff as "Elvis E. Johnson'...."[35] Further, the undisputed evidence at trial was that Johnson was listed in the Galveston telephone directory as "E.E. Johnson" with address of "25 Adler Circle" (the directory also separately listed him as "Johnny Johnson," again showing the same address and the same telephone number). The criminal information itself disclosed that the defendant "Elvis Johnson" was "a resident of Galveston, Texas." At the time of the events in issue, the Johnsons had lived at the Adler Circle address in Galveston for at least seven years, during all of which time he had worked as an executive at the American National headquarters, which was in Galveston, and since 1976 was Senior Executive Vice President there. Johnson was the number two executive at American National and reported directly to its board of directors, of which he was one of the ten or twelve members. Because the company's president

---

[35]Also, in writing the district clerk to set the criminal case, Johnson's counsel captioned the letter "Re: E.E. Johnson."

40

did not drink, Johnson was in effect its chief entertainer, and when in Galveston conducted business entertaining almost nightly at his home there. As a result, he said, "my home was sort of Grand Central Station" and his wife became "well known" for her role as hostess on these occasions. Mrs. Johnson described herself as an unpaid "hostess for the Company" who, with her husband, "entertained in our home" and "was expected to be at all entertainment affairs to greet everyone who came in."

Moreover, Johnson testified that American National was a large, publicly held corporation, operating throughout the country, that sent annual reports to its shareholders. As such, we judicially know that the company was required by law to file annual reports with the Securities and Exchange Commission (SEC) that disclosed the name, age, and all positions and offices with the company held by each director and executive officer.[36] Further, in

---

[36]17 C.F.R. § 240.13a-1 requires of publicly held corporations the filing each year with the SEC of "an annual report on the appropriate form authorized or prescribed therefor." The form prescribed for this purpose is the SEC Form 10-K. See Ratner & Hazen, *Securities Regulation, Selected Statutes, Rules, and Forms* (West 1993) at 912-22. Item 10 of the form requires the same information concerning "Directors and Executive Officers" as is "required by Item 401 of Regulation S-K." *Id.* at 920. Item 401 of Regulation S-K requires, among other things, the listing of "the names and ages of all directors" and "of all executive officers" of the company, with "all positions and offices with" the company "held by each such person." 17 C.F.R. § 229.401(a) & (b). Item 401 also provides in part as follows:

> "(f) *Involvement in certain legal proceedings.* Describe any of the following events that occurred during the past five years and that are material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant;

open court in the criminal case, Johnson was described as "an executive for the American National Insurance Company."

We reject the theory advanced in the second panel majority opinion, *Johnson v. Sawyer,* 4 F.3d at 387 & n. 87, that although the disclosed nonpublic record information—middle initial, age, street address, and executive job title—was not itself "private" in the relevant sense, nevertheless it became so *because* it would aid the public in identifying Johnson, the executive vice president of American National, as being the same person as the Elvis Johnson, an executive with American National residing in Galveston, who was recently convicted of felony tax evasion in the federal court in Galveston. But this enhanced ease of public identification does

---

....

(2) Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);  ..."  17 C.F.R. § 229.401(f).

The same requirements are all applicable to proxy statements, and these too must be filed with the SEC.  17 C.F.R. §§ 240.14a-3(a);  240.-14a-6;  240.14a-101, Item 7(b).  Shareholders must receive proxy statements and annual reports at the same time each year.  17 C.F.R. § 240.14a-3(b).

We, of course, take judicial notice of federal regulations. *See, e.g., McCormick on Evidence* § 335 at 939 (3d ed. 1984).

Similarly, Texas law required (and requires) corporate franchise tax reports to disclose at least annually "the name, title, and mailing address of each director and officer of the corporation" "which the Comptroller of Public Accounts shall forward to the Secretary of State to be available for public inspection."  See former V.A.T.C.S., Title 122A, Taxation-General, Art. 12.12 (now contained in Texas Tax Code §§ 171.203(a)(3) & (c) and 171.207(2)).

42

not make the middle initial, street address, or the like "private" information; to the contrary, it emphasizes the nonprivate nature of that information. Of course, the publication of nonprivate information—*e.g.,* a person's name or other identifying public facts about him—can invade the subject's privacy *where* it publicly ties that individual to some *private* occurrence that *is* intimate or embarrassing; for example, publicizing that the person who is having the previously secret affair with Mrs. X is the man named Mr. Y who lives at such and such an address. *Here, however,* the nonprivate identifying information—middle initial, street address, etc.—ties the subject only to what is properly *public* (his recent conviction in open court for felony tax evasion). Further, Johnson was not convicted under a pseudonym or concealed identity, but rather in open court—as required by the Constitution—under his own name (Elvis Johnson) pursuant to public proceedings that identified him as a Galveston resident employed as an American National executive having taxable income of $59,784.18 in 1975.[37] We likewise reject the argument that section 6103 makes *any* information disclosed in violation thereof private, intimate, and embarrassing as a matter of law, and that Texas courts would therefore hold that whoever publicizes any information contrary to section 6103 commits the Texas tort of invasion of privacy.

---

[37]We recognize that occasionally statutes provide for the use in certain criminal proceedings of a victim's pseudonym. *See, e.g.,* TEX.CODE CRIM.PROC. art. 57.02. We are aware, however, of no comparable statute, *state or federal,* authorizing a felony defendant's use of a pseudonym in the criminal proceedings against him. And, certainly, Johnson did not use one.

There are several things wrong with this. To begin with, section 6103 does not say that whatever is in a tax return is always private, intimate, and embarrassing. A tax return typically shows the taxpayer's name, occupation, employer, and address. The facts that Ronald Reagan was President of the United States and lived at the White House are not made private, intimate, and embarrassing by section 6103.[38] Obviously, this is not what section 6103 is concerned with. Section 6103 is a regulation of the conduct of those who in the course of their duties as government employees or contractors glean information from tax returns. The regulation is *prophylactic*, proscribing disclosure by such an individual of *any* of such information *so obtained* by him. Plainly, Congress was not determining that *all* the information on a tax

---

[38]Similarly, we of course recognize that private information does not *become* public merely because it is included in an official record which is *not* open to public inspection. Thus, *Restatement (Second) of Torts* § 652D comment *b* states that "[i]f a record is one not open to public inspection, as in the case of income tax returns, it is not public, and there is an invasion of privacy when it is made so." However, this obviously does not mean that *whatever* appears on an individual's income tax return is *therefore* necessarily "private" information about him protected by the invasion of privacy tort. What the quoted language *does* mean is that information that is *otherwise* "private" in the relevant sense does not *lose* its character as such by appearing on an official governmental record that is *not* open to public inspection, although it *would* lose its character as "private" *if* the record were open to public inspection. *See id.* comment *d.* Certainly Texas law follows this common sense approach, as the Texas Supreme Court clearly held in *Industrial Foundation* that information on a governmental record *not* open to public inspection could be partially *non*-"private"—such as the name of the person filing and the general nature of the form—and partially "private." *Id.* at 686 (but if the government record *is* open to public inspection, then giving publicity to any of it is not tortious no matter how "private" what is publicized may otherwise be. *Id.* at 684).

return would always be truly private and intimate or embarrassing. Rather, it was simply determining that since much of the information on tax returns does fall within that category, it was better to proscribe disclosure of *all* return information, rather than rely on *ad hoc* determinations by those with official access to returns as to whether particular items were or were not private, intimate, or embarrassing. Because such determinations would inevitably sometimes err, ultimately a broad prophylactic proscription would result in less disclosure by return handlers of such sensitive matters than would a more precisely tailored enactment.[39]

---

[39]These comments are similarly applicable to the then in force V.A.T.C.S., Title 122A, Taxation-General, art. 1.035 §§ 1 & 2 (now replaced by Texas Tax Code §§ 111.006 & 111.007) providing that federal tax returns (and federal tax return information) required to be filed with a state tax return filed with the Texas Comptroller of Public Accounts is confidential, and prohibiting disclosure thereof by any "official, employee, or former official or employee of the comptroller of public accounts." We also note that art. 1.035 in this respect was obviously responsive to section 6103(p)(8), which prohibits disclosure of return information to state authorities which require the state tax return to have attached a copy of the federal return, unless the state adopts laws protecting the confidentiality of the federal return copy attached to the state return. Also then in force was V.A.T.C.S., Title 122A, Taxation-General, art. 12.10A (now replaced by Texas Tax Code § 171.208), which proscribed disclosure by those "having access to any franchise tax report filed as provided by law" of "the amount or source of income, profits, losses, expenditures, or any particulars thereof, or any other information pertaining to the financial condition of the corporation set forth or disclosed in such report." None of these Texas statutes are (or were) applicable to personal tax returns, and none proscribed disclosure of the information acquired from other sources, or purported to make confidential such matters as the name, age (or date of incorporation), address, or type of business engaged in by the taxpayer, or the names, addresses, or titles of its officers and directors (which were required to be of public record, see n. 36, *supra* ), or whether or not the taxpayer (or any of its officers or directors)

45

Unlike section 6103(a), the Texas tort of "[p]ublic disclosure of embarrassing private facts about" another, *Industrial Foundation* at 682, is not concerned with the identity of the party making the disclosure, or his sources, but merely with whether the information disclosed is both private and intimate or embarrassing, and also not of public concern, *none* of which factors are relevant under the terms of section 6103(a). The Texas tort and section 6103(a) address totally distinct subject matters and impose distinctly different duties: the latter, applicable only to certain individuals who in connection with their government-related duties obtain tax return information, enjoins them not to disclose any of it so obtained, even though it is not private and not intimate or embarrassing and is of public concern; the former, applicable to all persons and regardless of the source of the information, proscribes publication thereof only if the matter is private and is intimate or embarrassing and is not of public concern.

In these circumstances, to say that section 6103 makes the information private for purposes of the Texas tort when it would not otherwise be so is simply another way of allowing recovery for the violation of section 6103(a)(1) itself, contrary to our noted holding in *Tindall* that "a federal regulation cannot establish a duty owed to the plaintiff under state law."[40]

had been convicted of a criminal offense.

[40]Nor have we been cited to any case in which intrinsically nonprivate information—such as name, age, address, and occupation—has been held "private" and "embarrassing" for purposes of the tort of disclosure of "embarrassing private facts about" another *merely* because it was disclosed contrary to a

Thus, the facts not previously disclosed in public in connection with the criminal case—Johnson's middle initial, age, street address, and executive title—were not "private" or "highly intimate and embarrassing" as required for the first element of the Texas tort of public disclosure of embarrassing private facts. While publication of these facts may have made it easier for the public to identify the "Elvis Johnson, a resident of Galveston, Texas," an American National executive, who was recently convicted by the federal court in Galveston, as the E.E. Johnson who was the senior executive vice president of American National, this would not disclose any private fact—Johnson having appeared in open court under his own name[41]—and Texas does not recognize a privacy cause of action for giving publicity to even highly private facts that are a matter of public record.

Moreover, we sustain the district court's determination that Johnson had not demonstrated that his conviction was not of

statute providing certain official information would not be disclosed. Such might be the result if the information so disclosed identified some truly private and embarrassing fact about the plaintiff; but not where what is thus revealed and embarrassing is a fact of public record, here a recent, local felony conviction in open court. As previously observed (see n. 38, *supra* ), the Texas common law recognizes that the mere fact that information appears in an official *non*public record does not *preclude* its being private and intimate or embarrassing and not of public concern; but it does not *make* it so. *Industrial Foundation* at 686.

[41]Thus, in *Cox Broadcasting,* the Supreme Court quoted with approval from *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947), in part as follows: " "A trial is a public event. What transpires in the courtroom is public property.' " *Cox Broadcasting* 420 U.S. at 492, 95 S.Ct. at 1045.

47

legitimate concern to the public, and thus failed to establish the third element of the Texas tort.[42]  The conviction was for a felony, carrying a penalty of up to five years' imprisonment, and requiring proof of specific criminal intent.  See n. 13, *supra.*  As the Texas Supreme Court recently held, after an exhaustive review of decisions throughout the nation, "[t]he weight of reason and authority lead us to the conclusion that a violation of 26 U.S.C. § 7201 involves moral turpitude *per se.*"  *Matter of Humphreys,* 880 S.W.2d 402, 408 (Tex.1994).  In *Cox Broadcasting,* the Court said "[t]he commission of crime, prosecutions resulting from it, and *judicial proceedings arising from the prosecutions,* however, *are without question events of legitimate concern to the public ....*" *Id.* 420 U.S. at 492, 95 S.Ct. at 1045 (emphasis added).  On this basis alone, it is evident that Johnson's recent conviction was "without question" a matter "of legitimate concern to the public."  Further, SEC regulations required (and require) that there be publicly reported annually as to each executive officer and director of a publicly held company such as American National not only such person's name and age and the positions and offices with the company held by such person, but also any criminal conviction (excluding traffic violations and other minor offenses) within the past five years if such conviction is "material to an evaluation of

---

[42]*See Industrial Foundation* at 684-85:  "The last requirement for an actionable invasion of privacy is that the information publicized not be of legitimate concern to the public."

the ability or integrity" of that person.[43]  The law has long considered conviction of any felony as material to an evaluation of the integrity of the person so convicted.  *See, e.g., Green v. Beck Laundry Machine Co.,* 490 U.S. 504, 521-26, 109 S.Ct. 1981, 1991-93, 104 L.Ed.2d 557 (1989) (witness veracity).  Indeed, an offense, such as a violation of section 7201, which is held to be one of "moral turpitude *per se," Matter of Humphreys,* would necessarily be material to an evaluation of the convicted person's integrity.[44]

_____

[43]See n. 36, *supra.*  All such information must also be included in the proxy statements which must accompany the annual reports sent the shareholders.  *Id.*

[44]*See also* TEX.INS.CODE ANN. art. 21.07-3, § 12(f) (conviction of any felony grounds for revocation of license of managing general agent;  while Johnson may not have been a managing general agent, it is undisputed that a major portion of his duties consisted of performing functions very similar to those of a managing general agent as defined in TEX.INS.CODE ANN. art. 21.07-3 § 2(a)).

    The district court's determination that Johnson's conviction was not a matter "that a reasonable investor would consider ... important in deciding whether to invest," 760 F.Supp. at 1230, is not controlling as to whether Johnson's conviction would have to be included in the annual report to the SEC and in the proxy statement.  To begin with, the test under the regulations is not the conviction's materiality to the investment decision, but is rather its materiality "to an evaluation of the ... integrity of" the person convicted.  Further, the district court based its conclusion on the assumption that the investor would know that Johnson was in fact not guilty of a section 7201 violation.  760 F.Supp. at 1220, 1221, 1230 (indeed, at trial the court observed that "what Mr. Johnson did here was, in effect, like getting a speeding ticket").  This approach, however, is wide of the mark, for the question is not whether what Johnson did, or says he did, is material, but rather whether his "conviction" (or what he was convicted of) is material (to an evaluation of his integrity).  Further, as previously noted, Johnson is estopped to challenge his guilt of the section 7201 offense as alleged in the information.  See n. 13, *supra.*

49

Accordingly, it is clear that Johnson's conviction—as well as his name, age, and positions with American National—was a matter of legitimate concern to the public.[45]

We accordingly affirm the district court's determination that Johnson has not made out a case under the Texas tort of public disclosure of embarrassing private facts about the plaintiff. The disclosure was of information either of public record or otherwise neither private nor highly intimate or embarrassing, and the information was also of legitimate concern to the public.

## Conclusion

This FTCA action has always been grounded on asserted violations of section 6103(a)(1) by IRS employees in the scope of their employment.[46] However, the FTCA requires that the duty

---

[45]Moreover, that Johnson's felony conviction is a matter of legitimate public concern likewise renders nonintimate information tending to identify him as the person so convicted—such as his name, age, residence, job title—likewise of legitimate public concern. The two are really inseparable. *Cf. Ross v. Midwest Communications, Inc.,* 870 F.2d 271, 274 (5th Cir.1989).

[46]Because Johnson has never complained of any disclosure assertedly in violation of section 6103(a) that disclosed matters of open public record, we need not and do not determine whether to follow the rule of *Lampert v. United States,* 854 F.2d 335, 338 (9th Cir.1988), *cert. denied,* 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989), that section 6103(a) does not bar disclosure of matters of public record. We observe, however, that such a bar, at least as to recent federal felony convictions, would appear in some tension with *Cox Broadcasting. See also Innovative Database Systems v. Morales; United States v. Wallington,* 889 F.2d 573, 576 (5th Cir.1989) (construing narrowly, to avoid First Amendment concerns, nondisclosure provisions of 18 U.S.C. § 1905). Nor do we decide what breadth *Lampert* should have, were we to adopt it.

Further, we assume, *arguendo only,* that there is sufficient evidence that the press releases, or the

50

breached by the government employees be not simply one imposed by federal statute or regulation, but rather arise under state law. This requirement for a breach of state law duty is not met simply by invoking general state law principles of *respondeat superior* or failure to supervise. Nor may the requirement be fulfilled by simply invoking the state's general negligence *per se* doctrine. That is particularly so in the present setting where there is nothing to indicate that the state would invoke that doctrine to create a common law cause of action for violation of section 6103(a)(1) where there was already a comprehensive federal statutory cause of action therefore, here section 7217. Finally, while Johnson may have stated a state law claim for defamation, that is exempted from the FTCA. To the extent, if any, not so exempted, "false light" is not recognized in Texas. The district court correctly denied recovery on these claims, as well as on Johnson's claim for breach of fiduciary duty.[47] Johnson's core assertion of a Texas law duty is that, established in *Industrial Foundation,* not to publicly disclose embarrassing private facts about another. We hold that the district court correctly denied recovery in this respect. Johnson has not made out a case on this basis. The facts disclosed were not private and were of legitimate

challenged matters therein that may have enhanced the public's ability to identify Johnson, were a cause of his complained of loss of position.

[47]As to the latter, we are in general agreement with the district court's analysis. 760 F.Supp. at 1232-33. It is evident that Johnson and the IRS knowingly stood in an adversarial relationship, one to the other, and that Johnson looked to his lawyer, not to the IRS or Powers, for advice.

public concern.

For the reasons stated, the judgment of the district court is REVERSED and the cause is REMANDED with directions that Johnson's FTCA claim be DISMISSED.

WIENER, Circuit Judge, dissenting, joined by JOHNSON, Circuit Judge.

My usual temerity—and Judge Johnson's—in dissenting from any of Judge Garwood's opinions is heightened in this instance by the awareness of the landslide concurring vote that his opinion was given by our colleagues on the en banc court. But as the erstwhile panel majority, Judge Johnson and I remain convinced that Mr. E.E. Johnson was entitled to recover under the FTCA. Having killed so many trees, however, through publication of our original panel majority opinion (first opinion)[1] and our supplemental and amending panel opinion (second opinion),[2] we shall refrain from regurgitating ad nauseam the pertinent facts and the law as we see it. Rather, we reiterate and adopt by reference the factual and legal positions we espoused in our second opinion.

Our unwavering belief continues to be that the district court correctly concluded, albeit for the wrong reasons, that Mr. Johnson did have a valid cause of action under the FTCA. The basis for the district court's judgment, which we erroneously adopted in our first opinion, was that the requisite state law *cause of action* (and thus the "duty" owed) for Johnson's FTCA claim was supplied by

---

[1]*Johnson v. Sawyer,* 980 F.2d 1490 (5th Cir.1992).

[2]*Johnson v. Sawyer,* 4 F.3d 369 (5th Cir.1993).

52

§ 6103, a federal statute. We did our best in our second opinion, however, to correct our mistake, first by expressly disavowing our earlier pronouncement and then by affirming the district court for reasons which were and remain valid under the FTCA: The state *cause of action* required for a valid FTCA claim is here supplied by one of Texas's recognized invasion-of-privacy torts—usually denominated "public disclosure of embarrassing facts"—as well as by negligence per se. We tried carefully to distinguish the *duty owed* from the *standard of care required* in the performance of that duty. In this dichotomy, the prerequisite state tort created the *duty* and thus the cause of action for a breach thereof; the federal statute—§ 6103—merely supplied the *standard of care* for determining whether the duty was breached.

Regrettably, the en banc majority opinion from which we dissent today turns a blind eye to this dichotomy when it states, in its opening paragraph, that the panel majority "ultimately grounds the duty not to disclose on federal law." By thus misreading or mischaracterizing the principal thrust of our second opinion, the en banc majority opinion essentially ignores the duty/standard of care analysis of our second opinion. Consequently, the en banc majority opinion wrongly concentrates its efforts on rejecting our *first* opinion's admittedly erroneous contention that § 6103 was the source of the duty owed to Mr. Johnson rather than the measure of the standard of care for a performance or breach of a state law duty. But we already rejected that theory when we filed the second opinion! Because our

53

colleagues who have concurred in the en banc majority opinion seem nevertheless to have swallowed its legal legerdemain hook, line and sinker, there is nothing left for us to say except "Please—go back and re-read our second opinion!"

We believe that the propriety of this entreaty is confirmed by the quantity of ink devoted in the en banc majority opinion to justifying its conclusion that those facts included in the press release that *were* return information but *were not* public record[3] were somehow not the kind of private facts that are actionable under the state tort that we, in our second opinion, insisted did establish the state law duty and thus the predicate state law cause of action for FTCA purposes. If we had indeed merely continued to hold that Johnson's FTCA cause of action was grounded in § 6103, would the en banc majority have felt so strongly compelled thus to explain away the Texas statutory tort by characterizing the non-public record, return facts as *not* embarrassing? "The lady doth protest too much, me thinks."[4]

Reduced to its barest essentials, our position was and remains that a private citizen has a *duty* under the Texas tort law not to do what the IRS agents, particularly Special Agent Stone, did here. Consequently, the FTCA *is* available to those like Johnson to whom such a duty is owed. Our second opinion demonstrates the

_____

[3]Remember, the record of the plea and sentencing hearing was not even transcribed and filed until more than three months after the damaging news releases were disseminated and published, and well after Mr. Johnson was demoted and removed from the company's Board of Directors.

[4]Shakespeare, *Hamlet* III, ii, 242.

availability of that Texas tort to serve as the state law basis for Johnson's FTCA claim.

Only after successfully completing the search for a state law cause of action do we look to the federal statute—§ 6103—and then only as the source of an applicable yardstick, the standard of care against which to test the federal agents' actions that so undeniably damaged Mr. Johnson. In this second inquiry there can be no serious dispute that Texas courts examining the actions of private citizens accused of breaching a state law duty can and frequently do use the provisions of statutes—not just state or local but federal as well—as standard-of-care yardsticks. Given the state law duty and the statutory standard of care, Mr. Johnson's right to seek recovery under the FTCA is unassailable.

I respectfully dissent.